[No. B208046. Second Dist., Div. Three. May 13, 2009.]

ARA MELKONIANS, Plaintiff and Appellant, v.
LOS ANGELES COUNTY CIVIL SERVICE COMMISSION et al.,
Defendants and Respondents.

1160

Counsel

Green & Shinee and Helen L. Schwab for Plaintiff and Appellant.

Law Offices of William Balderrama and William Balderrama for Defendants and Respondents.

## Opinion

**KLEIN, P. J.**—Ara Melkonians appeals from an order denying a petition for writ of mandate (Code Civ. Proc., § 1094.5) by which he sought to overturn the termination of his employment with the Los Angeles County Sheriff's Department (the Department) for violation of the Department's policies regarding conduct toward others.

Melkonians contends a tape-recorded telephone call made by the complaining witness in the underlying incident of domestic violence did not qualify as

a spontaneous statement (Evid. Code, § 1240), Melkonians was denied the right to confront and cross-examine the complaining witness (*Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354]), the evidence was insufficient to support the alleged violation, and the Department did not give notice of its intent to terminate within one year as required by the Peace Officers Bill of Rights Act (Gov. Code, § 3304, subd. (d)).

We reject these contentions and affirm the denial of Melkonians's writ petition.

## BACKGROUND

1. *The underlying incident of domestic violence and evidence before the Civil Service Commission.*

The evidence adduced before the Los Angeles County Civil Service Commission (Civil Service Commission) indicated Yajera Morales dated Melkonians for three or four months. When she tried to distance herself from him, he persisted in attempting to see her. On March 7, 2003, Melkonians and Morales spoke on the telephone while Morales was away from her apartment. Morales returned home and parked her car sometime after 4:00 p.m. Melkonians telephoned her and said he already was inside her apartment, having crawled through a window. When Morales arrived at the apartment, she became upset and asked Melkonians to leave, but he refused.

Morales went into a bedroom and asked a passing female to call the police. When Morales tried to leave the room, Melkonians grabbed Morales by the mouth "really hard." Morales had undergone facial surgery nine days earlier. Morales bit Melkonians's hand to stop him from grabbing her face. Even then, Melkonians did not release his grip and continued to hold her mouth. Morales told Melkonians to leave her alone and said she was going to get a restraining order. Melkonians said if she did that, she would be sorry. Melkonians also told Morales a piece of paper was not going to save her.

Melkonians was inside the apartment for approximately 45 minutes. When Melkonians left, Morales called 911 at 5:05 p.m. and called information (411) at 5:07 p.m. At 5:09 p.m., she called the business line of the West Hollywood sheriff's station. The conversation with the answering deputy was tape-recorded. Morales spoke in a halting and emotion-laden voice; she clearly was upset.[1] Morales stated: "Hi, I have a question if you have time for me to

---

[1] The tape recording of the telephone call was an exhibit at the Civil Service Commission hearing and a copy of the recording has been lodged with this court. We have listened to the tape recording in connection with our review of this matter.

answer. I have a boyfriend and he is a cop and he broke into my house, broke the window." After the deputy ascertained the boyfriend no longer was there, the deputy asked for Morales's address. Morales responded, "I just have a question for he told me if I call the cops (unintelligible). He say if I call the cops I will get in trouble." Morales indicated she had been struck in the face and had been told that she could not get a restraining order against a police officer. The dispatcher indicated a restraining order could be obtained at the Santa Monica courthouse and asked if Morales wanted to report the incident. When Morales indicated the boyfriend knew where she worked, the deputy indicated the restraining order would cover her workplace.

At that point in the conversation, the dispatcher asked Morales to hold.[2] Deputy Klaus then picked up the line and asked how he could help Morales. Morales, still speaking haltingly and with much emotion, responded, "How can I do to get a restraining order?" Klaus referred Morales to the Santa Monica courthouse, then asked why she needed a restraining order. Morales indicated her boyfriend, Melkonians, was a sheriff's deputy in West Hollywood. "And he broke through my window and he hit me in my face." When Klaus indicated a deputy should take a report on the matter, Morales responded: "No, no, no I just want to get a restraining order. He told me if I called the cops he said I am going to be sorry later . . . ."

Klaus again suggested a report should be filed, but Morales responded: "Well he said if I do that I am going to be sorry." "He said, who do you think they are going to believe, him or me." Klaus obtained Morales's name and telephone number and asked to send someone to take a report. Morales replied, "Please no, because I'm scared," and indicated she would just get a restraining order. When Klaus noted Morales could not get a restraining order until Monday, Morales stated: "I am going to wait until Monday and Monday will leave my house and I am going to wait until Monday. He told me, I told him that I can take a restraining order, and he told me, do you think that piece of paper is going to save you. (CRYING)."

Within a half-hour of the telephone call, Lieutenant Donnie Mauldin, the watch commander of the West Hollywood sheriff's station, arrived at Morales's apartment. Mauldin noticed a yellow Viper parked at the rear of the building and later learned the car belonged to Melkonians. Mauldin saw that Morales had a black eye, her cheek looked swollen and she had marks on her upper chest. She appeared to have been crying and looked upset.

---

[2] The deputy who answered the call interrupted Morales several times to take other incoming calls. These interruptions are included in the tape recording of the telephone call. However, they are not included in the typed transcript of the call found in the administrative record.

Mauldin videotaped an interview with Morales. In the interview, Morales said Melkonians was outside the apartment when she called the West Hollywood station and was outside as recently as 10 minutes earlier. Morales then recounted the incident as set forth above.[3] Morales told Mauldin she did not want Melkonians to know she had filed a report because he told her she would be sorry if she did. Mauldin observed a picture of Melkonians in the mirror of Morales's bedroom. Written next to the picture was, "don't fuck with this."

After the interview, Melkonians approached Mauldin on the street in front of Morales's apartment complex. Mauldin arrested Melkonians on charges of burglary, domestic violence and false imprisonment. Sometime prior to being arrested, Melkonians filed a police report with the Los Angeles Police Department in which he claimed Morales asked him to crawl through a window of her apartment because she locked her keys inside. Further, when Melkonians emerged from the apartment, Morales "flipped out" and began striking him with a closed fist and broke a glass figure on his hand, causing a small puncture wound.

Deputy Sheriff Marcus Hershey, a sergeant assigned to the Los Angeles County Sheriff's Internal Criminal Investigation Bureau (ICIB), arrived at Morales's apartment at approximately 8:30 p.m. Hershey spoke to Lieutenant Mauldin, then tape-recorded an interview with Morales. Hershey's partner, Sergeant Reinhardt Schuerger, examined Morales's cell phone. It indicated she called 911 at 5:05 p.m. and she called 411 at 5:07 p.m. Morales said she called 911 first, but no one answered. She then called 411 to get the number of the West Hollywood sheriff station.

A supplementary report indicates Hershey met Morales at a hair salon on April 3, 2003. Melkonians drove Morales to the meeting. Morales gave Hershey her new temporary address. Morales admitted she went to Las Vegas with Melkonians after the incident of March 7, 2003. Morales was reluctant to speak with Hershey and wished to sign a complaint refusal form. Morales wrote on the form in Spanish that she wanted to forget what happened and did not want to feel stressed. Hershey asked Morales to stay in contact with him. Morales gave Hershey her mother's telephone numbers in Costa Rica and the telephone number at Hershey's temporary residence.

Division Chief of Patrol Ronnie Williams, the Department's decision maker in the discharge of Melkonians, testified Melkonians had 14 administrative hearings in 10 years of service and nine of the allegations were sustained. One of the sustained allegations grew out of an incident of

---

[3] Morales did not testify at the administrative hearing.

domestic violence in 1994.[4] Additionally, Melkonians was discharged on April 27, 2003, for numerous violations of Department policy in 2002.[5] Melkonians's behavior brought embarrassment and discredit to the Department and exposed the Department to civil liability.

The ICIB investigator's log detailed the efforts of Investigator Hines to contact Morales.

On December 9, 2003, Melkonians's attorney left a message with the investigator, which indicated Melkonians was not willing to make a voluntary statement and that Melkonians could be deemed as otherwise unavailable to participate in an interview.

### 2. Procedural matters.

#### a. The incident involving Morales.

On May 27, 2003, the city attorney's office indicated it did not intend to prosecute Melkonians in this case. On September 18, 2003, the city attorney reported Melkonians had agreed to attend 26 sessions of domestic violence counseling and the case against Melkonians would remain open during the three-year criminal limitations period in the event of further incidents.

The Department mailed a termination letter to Melkonians on May 13, 2004, which was returned unclaimed. The Department mailed a similar letter to Melkonians on July 22, 2004.

Melkonians appealed the discharge to the Civil Service Commission, which conducted the hearing at which the above evidence was adduced. (See *Skelly v. State Personnel Bd.* (1975) 15 Cal.3d 194, 215 [124 Cal.Rptr. 14, 539 P.2d 774].)

#### b. The termination arising out of the 2002 violations.

The Department terminated Melkonians on August 27, 2003, as a result of the 2002 violations. Melkonians appealed that termination and, on July 15,

---

[4] In that case, Melkonians received a five-day suspension after breaking into his then girlfriend's residence following a verbal altercation. Eight days later, Melkonians returned to the location and removed a cat that belonged to his girlfriend. Melkonians also allowed his unloaded weapon to be used in an unauthorized manner.

[5] The incidents involved in this discharge included threatening his then girlfriend and falsely reporting to the Los Angeles Police Department that his girlfriend was in danger from an ex-boyfriend, failing to document an attempted burglary/domestic violence incident and pointing a Taser device at a nonthreatening suspect.

2004, the parties agreed to reduce the penalty to a 30-day suspension. As a result of the settlement, Melkonians received eight months of backpay.

### 3. *The decision of the Civil Service Commission.*

The hearing officer noted the issues presented were the truth of the Department's allegations and whether the discipline was timely and appropriate. The hearing officer found Morales's telephone call to the West Hollywood sheriff station qualified as a spontaneous statement because Morales made the call immediately after the confrontation and stated Melkonians "broke through my window and hit me in the face." Morales also said " '[h]e told me if I called the cops . . . I am going to be sorry later . . . .' [Morales] stated she was scared."

The hearing officer found termination was an appropriate penalty and the termination action was timely because the criminal case against Melkonians remained open until the three-year statute of limitations ran. Thus, under Government Code section 3304, subdivision (d)(1), the one-year statute of limitations applicable to the Department's termination of Melkonians had not commenced to run.[6]

The Civil Service Commission adopted the decision of the hearing officer. Melkonians sought review of the decision by writ of administrative mandate.

### 4. *The trial court denies Melkonians's writ petition.*

The trial court found, with respect to the telephone call, the "circumstances suggest that Morales was acting under the stress of excitement of the moment . . . . The events were certainly sufficiently startling to produce nervous excitement and render Morales's statements spontaneous and unreflecting. Nor was there time to contrive and misrepresent." The trial court found, in effect, an "excited utterance." The trial court noted the evidence showed Melkonians remained outside the apartment until a few minutes before Mauldin arrived, Morales's statements related to the events preceding it, and Morales made the call immediately after the event.

The trial court conceded application of the spontaneous statement exception was undermined to some extent because the stated purpose of Morales's call was to inquire about a restraining order. However, the trial court concluded the hearing officer did not abuse its discretion in finding the

---

[6] Government Code section 3304, subdivision (d)(1), provides: "If the act, omission, or other allegation of misconduct is also the subject of a criminal investigation or criminal prosecution, the time during which the criminal investigation or criminal prosecution is pending shall toll the one-year time period."

telephone call qualified as a spontaneous statement based on the timing of the call, the fact Morales cried during the conversation and the content of her statements.

With respect to the one-year statute of limitations (Gov. Code, § 3304, subd. (d)), the trial court found it was tolled until May 27, 2003, when the prosecutor indicated no criminal complaint would be filed with respect to the incident involving Morales. The trial court further found the statute applied only to active public safety officers. Thus, the statute again was tolled from August 27, 2003, until July 15, 2004, while Melkonians was discharged from service as a result of the 2002 violations. By excluding the period of Melkonians's discharge from the limitations period, the trial court concluded the July 22, 2004 notice of intent to terminate Melkonians was timely.

The trial court also found Melkonians's counsel complained in a letter dated June 23, 2004, that the Department lacked jurisdiction to conduct a hearing when Melkonians was not an employee. Counsel objected to the Department's second attempt to discharge Melkonians while the appeal of the first discharge remained pending. Counsel further indicated Melkonians would not voluntarily participate in an interview and he could be deemed otherwise unavailable. The trial court noted the limitation period does not apply where an officer is unavailable. (Gov. Code, § 3304, subd. (d)(5).)

## CONTENTIONS

Melkonians contends Morales's telephone call to the West Hollywood sheriff's station did not qualify as a spontaneous statement, Melkonians improperly was denied the right to cross-examine Morales, the evidence did not support the alleged violations and the Department failed to commence proceedings against Melkonians in a timely manner.

## DISCUSSION

1. *Standard of review.*

Discipline imposed on public employees affects their fundamental vested right in employment. (*McMillen v. Civil Service Com.* (1992) 6 Cal.App.4th 125, 129 [8 Cal.Rptr.2d 548].) When a fundamental vested right is at issue, and a writ proceeding is commenced, an independent judgment standard of review, rather than the substantial evidence test, is applied. (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 816, fn. 8 [85 Cal.Rptr.2d 696, 977 P.2d 693].) Under the independent judgment test, the trial court independently examines the administrative record for errors of law and exercises its independent judgment upon the evidence. (*Bixby v. Pierno* (1971) 4 Cal.3d 130, 143, fn. 10

[93 Cal.Rptr. 234, 481 P.2d 242].) After the trial court exercises its independent judgment, the appellate court need only review the record to determine whether the trial court's findings are supported by substantial evidence. (*Ibid.*) We must sustain the trial court's factual findings if substantial evidence supports them. (*Ibid.*; *Evans v. Department of Motor Vehicles* (1994) 21 Cal.App.4th 958, 967, fn. 1 [26 Cal.Rptr.2d 460].) We resolve all conflicts in the evidence and must draw inferences in support of the judgment. However, we independently determine questions of law. (*Anserv Ins. Services, Inc. v. Kelso* (2000) 83 Cal.App.4th 197, 204 [99 Cal.Rptr.2d 357].)

We will therefore review questions of law independently, while deferring to the trial court's findings on questions of fact.

### 2. *Morales's telephone call to West Hollywood sheriff's station.*

Melkonians contends the telephone call to the West Hollywood sheriff's station did not qualify as a spontaneous statement because it was a "non-emergent phone call to the Department's business line made by Morales after the incident had occurred and when she wanted to ask a question about a restraining order." Melkonians notes Morales started the conversation by indicating she was calling to ask a question "if you have time . . . to answer."

Further, when Morales was asked if a patrol vehicle should be sent to her home, Morales said she just wanted to get a restraining order. Later in the conversation, Morales said she would wait until Monday to get a restraining order. Also, Morales mentioned numerous times she was worried what Melkonians would do if he learned she had called the police. Thus, Morales was deliberating a future course of action, getting a restraining order, and her reflective powers were not in abeyance.

Melkonians further asserts all the information Morales provided in the telephone call came in response to questions about the incident. Also, Morales had time to reflect on the incident and plan a course of action such that she was no longer under the influence of the immediate excitement of the incident. Melkonians argues Morales's statements were not so spontaneous and unreflecting such that it could be said the excitement dominated her reflective powers rendering her statement in response to police questioning uncontrived. (*People v. Poggi* (1988) 45 Cal.3d 306, 318 [246 Cal.Rptr. 886, 753 P.2d 1082].)

Melkonians concludes the statements in the telephone call should not have been admitted for the truth of the matter asserted and, absent those statements, the Department failed to prove its case.[7]

■ The law to be applied is well settled. A statement may be admitted, though hearsay, if it describes an act witnessed by the declarant and was "made spontaneously while the declarant was under the stress of excitement caused by" witnessing the event. (Evid. Code, § 1240.) " 'To render [statements] admissible [under the spontaneous declaration exception] it is required that (1) there must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it.' [Citations.]" (*People v. Poggi, supra,* 45 Cal.3d at p. 318.)

■ The word "spontaneous" as used in Evidence Code section 1240 means "actions undertaken without deliberation or reflection. . . . [T]he basis for the circumstantial trustworthiness of spontaneous utterances is that in the stress of nervous excitement, the reflective faculties may be stilled and the utterance may become the instinctive and uninhibited expression of the speaker's actual impressions and belief." (*People v. Farmer* (1989) 47 Cal.3d 888, 903 [254 Cal.Rptr. 508, 765 P.2d 940], overruled on another point in *People v. Waidla* (2000) 22 Cal.4th 690, 724, fn. 6 [94 Cal.Rptr.2d 396, 996 P.2d 46].) The crucial element in determining whether a statement is admissible as a spontaneous statement is the mental state of the speaker. (*People v. Farmer, supra,* at p. 903.) "The nature of the utterance—how long it was made after the startling incident and whether the speaker blurted it out, for example—may be important, but solely as an indicator of the mental state of the declarant." (*Id.* at pp. 903–904.)

"Whether the requirements of the spontaneous statement exception are satisfied in any given case is, in general, largely a question of fact. [Citation.]" (*People v. Poggi, supra,* 45 Cal.3d at p. 318.) The trial court's determination of preliminary facts will be upheld if supported by substantial evidence. (*People v. Brown* (2003) 31 Cal.4th 518, 541 [3 Cal.Rptr.3d 145, 73 P.3d 1137].) However, "[w]e review for abuse of discretion the ultimate

---

[7] Hearsay alone will not support an administrative charge of malfeasance. (*Walker v. City of San Gabriel* (1942) 20 Cal.2d 879, 881–882 [129 P.2d 349], overruled on other grounds in *Strumsky v. San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 37–38, 44–45 [112 Cal.Rptr. 805, 520 P.2d 29]; *Garamendi v. Golden Eagle Ins. Co.* (2005) 128 Cal.App.4th 452, 476 [27 Cal.Rptr.3d 239]; *Ng v. State Personnel Bd.* (1977) 68 Cal.App.3d 600, 604 [137 Cal.Rptr. 387].)

decision whether to admit the evidence." (*People v. Phillips* (2000) 22 Cal.4th 226, 236 [92 Cal.Rptr.2d 58, 991 P.2d 145].)

■ We discern no basis upon which the trial court's finding in this case might be set aside. Morales was distraught and tearful during the conversation. She spoke haltingly and with obvious emotion and nervous excitement about a recent incident. None of her statements were self-serving. She cried openly at the end of the conversation with Deputy Klaus. Numerous cases have found statements similar to the one made by Morales admissible as spontaneous declarations. (E.g., *People v. Corella* (2004) 122 Cal.App.4th 461, 466 [18 Cal.Rptr.3d 770]; *People v. Jackson* (1986) 178 Cal.App.3d 694, 699 [224 Cal.Rptr. 37].)

Melkonians further contends the tape recording presented the telephone call in a single cohesive conversation, thereby creating a false sense of urgency. In fact, the telephone call was interrupted numerous times when the deputy who answered the call placed Morales on hold to answer other incoming calls. According to Melkonians, when considered in the context of the many other calls coming in, Morales's call must be viewed as a request for information.

However, the tape recording of the conversation found in the administrative record lodged with this court includes the interruptions. Nothing about these interruptions detracts from the trial court's finding the spontaneous statement exception applies. Indeed, the halting and emotional nature of Morales's speech contrasts vividly with the speech patterns of the other callers.

Melkonians also argues the incident allegedly provoking the nervous excitement "was of a nature (boyfriend/girlfriend dispute) that was not sufficiently stressful . . . so as to render Morales's statements" spontaneous. Melkonians catalogs numerous criminal cases in which the incident giving rise to the spontaneous statement was more serious than a minor domestic dispute and concludes the tape-recorded telephone conversation should not have been admitted for the truth of the matter asserted.

Concededly, criminal cases in which the spontaneous statement exception arises frequently involve more serious injuries or more egregious conduct than the injuries suffered by Morales or the conduct of Melkonians. For example, in *People v. Raley* (1992) 2 Cal.4th 870, 893–894 [8 Cal.Rptr.2d 678, 830 P.2d 712], the victim of a sexual attack suffered a traumatic head injury, was near death and had been lying in a ravine bleeding for 18 hours when she made the relevant statements. However, this does not mean the spontaneous statement exception applies only in such cases. The mental state of the

speaker is the determinative factor. (*People v. Farmer, supra,* 47 Cal.3d at p. 903.) The evidence shows Morales spoke spontaneously and while nervous excitement continued to dominate and her reflective powers remained in abeyance.

In sum, substantial evidence supports the trial court's determination the telephone call came within the spontaneous statement exception to the hearsay rule.

### 3. The right to cross-examine Morales.

Melkonians contends Los Angeles County Civil Service Rules, rule 4.07, which provides that a petitioner has the right to cross-examine witnesses, engrafts onto civil service proceedings the right enunciated in *Crawford v. Washington, supra,* 541 U.S. at page 59 (testimonial statements of an absent witness may be admitted only where the declarant is unavailable and the defendant has a prior opportunity to cross-examine).[8] Melkonians argues admission of Morales's statement violated *Crawford* because he had no prior opportunity to cross-examine and there was no showing Morales was unavailable to testify. (*People v. Mendieta* (1986) 185 Cal.App.3d 1032, 1038–1039 [230 Cal.Rptr. 162]; Evid. Code, § 240, subd. (a)(5).)

Melkonians concedes it has been held that *Crawford* does not apply in administrative proceedings such as disbarment. (*Rosenthal v. Justices of the Supreme Court of California* (9th Cir. 1990) 910 F.2d 561, 565.) However, Melkonians asserts civil service rule 4.07 removes this case from application of the general rule.

■ We are not persuaded. As noted in *Rosenthal,* "The confrontation clause is a criminal law protection. Therefore, it does not apply to a disbarment case." (*Rosenthal v. Justices of the Supreme Court of California, supra,* 910 F.2d at p. 565.) Similarly, *Crawford* does not apply to probation revocation proceedings. (*People v. Johnson* (2004) 121 Cal.App.4th 1409, 1411 [18 Cal.Rptr.3d 230]; see also *United States v. Martin* (8th Cir. 2004) 382 F.3d 840, 844, fn. 4 [*Crawford* does not apply to proceedings relating to revocation of supervised release]; *United States v. Barraza* (S.D.Cal. 2004) 318 F.Supp.2d 1031, 1035 [same]; but see *Ash v. Reilly* (D.D.C. 2004) 354 F.Supp.2d 1, 9–10 [*Crawford* applies to parole revocation hearing].)

Melkonians's interpretation of civil service rule 4.07 also is at odds with rule 4.10. Rule 4.10(A) provides: "Any relevant evidence shall be admitted if

---

[8] Civil service rule 4.07 provides a petitioner shall be entitled to be represented by counsel; testify under oath; subpoena witnesses; cross-examine witnesses; cross-examine all employees of the commission who have investigated the matters; impeach any witness; present affidavits, exhibits, and other evidence; and argue the case.

it is the sort of evidence on which responsible persons are accustomed to rely in the conduct of serious affairs, regardless of the existence of any common law or statutory rule which might make improper the admission of such evidence over objection in civil actions." Rule 4.10(B) provides "Hearsay evidence may be admitted for any purpose, but shall not be sufficient in itself to support a finding unless it would be admissible over objection in civil actions."

Melkonians points to no authority that suggests civil service rule 4.07 takes precedence over rule 4.10 or that Melkonians has a greater right to cross-examine witnesses than any other litigant in an administrative proceeding.

■ In any event, even if *Crawford* applied to the administrative proceedings, no violation of the right to confront and cross-examine appears. This is so because *Crawford* only applies to the admission of testimonial hearsay statements. (*People v. Gutierrez* (2009) 45 Cal.4th 789, 812 [89 Cal.Rptr.3d 225, 200 P.3d 847]; *People v. Geier* (2007) 41 Cal.4th 555, 597 [61 Cal.Rptr.3d 580, 161 P.3d 104]; *People v. Cage* (2007) 40 Cal.4th 965, 984 [56 Cal.Rptr.3d 789, 155 P.3d 205].)

"Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Davis v. Washington* (2006) 547 U.S. 813, 822 [165 L.Ed.2d 224, 126 S.Ct. 2266], fn. omitted.)

Here, the evidence indicated Morales's telephone call was initiated "to deal with a contemporaneous emergency, rather than to produce evidence about past events for possible use at a criminal trial." (*People v. Cage, supra,* 40 Cal.4th at p. 984.) Because Morales's statements were nontestimonial, admission of the tape-recorded telephone call did not violate *Crawford*.

The fact Morales called the business line of the sheriff's station, rather than 911, does not alter our conclusion. The call was the functional equivalent of a 911 call. (*People v. Saracoglu* (2007) 152 Cal.App.4th 1584, 1591 [62 Cal.Rptr.3d 418] [victim's statements at the police station were the functional equivalent of calling 911].)

In sum, we conclude *Crawford* presents no impediment to the admission of Morales's telephone call to the West Hollywood sheriff's station.

### 4. *Sufficiency of the evidence.*

Melkonians contends the evidence of misconduct was insufficient to uphold the termination. He argues the injuries to Morales's face were explained by her recent plastic surgery, injuries to her wrist resulted from a bracelet and Morales indicated her dog recently had bitten her. No medical treatment was requested by or offered to Morales. Melkonians concludes the evidence shows he was not the cause of any of Morales's injuries.

Viewed in the light applicable to our review, the evidence clearly was sufficient to support the allegations of misconduct. With respect to the injuries to Morales, Mauldin saw that Morales had a black eye, her cheek looked swollen and she had marks on her upper chest. Morales stated Melkonians grabbed her face and caused the marks on her chest during the struggle. Moreover, even if Melkonians is correct with respect to the physical injuries to Morales, the evidence showed he broke into her apartment and falsely imprisoned her in the bedroom after she called out to a passerby.

Thus, the evidence amply supported the allegations of misconduct.

### 5. *The Department gave timely notice of the termination proceedings.*

Melkonians contends the Department could not discipline him in this matter because it failed to bring charges within the one-year statute of limitations of Government Code section 3304, subdivision (d). Melkonians argues that, because he was reinstated retroactively pursuant to the settlement agreement he reached with the Department regarding the 2002 violations, there was no break in his service as a deputy sheriff and he cannot be deemed to have been unavailable for service of the second discharge action until July 15, 2004, as found by the trial court. Melkonians asserts the Department must have been aware of the affect of reinstating Melkonians retroactively when it negotiated the settlement, which was reached after the Department had commenced the present discharge action against Melkonians.

Melkonians concludes the one-year limitations period expired on May 27, 2004, one year after the Department commenced its investigation based on the prosecutorial reject of May 27, 2003. Thus, the notice mailed on July 22, 2004 was not timely.

The Peace Officers Bill of Rights Act (Gov. Code, § 3300 et seq.; hereafter, the Act) sets forth a list of basic rights and protections which must be afforded all peace officers by the public entities which employ them. (*Mays v. City of Los Angeles* (2008) 43 Cal.4th 313, 320 [74 Cal.Rptr.3d 891, 180 P.3d 935].) Section 3304, subdivision (d), of the Act states a limitations

period for initiation of punitive action against a peace officer. As relevant here, it states: "[N]o punitive action, nor denial of promotion on grounds other than merit, shall be undertaken for any act, omission, or other allegation of misconduct if the investigation of the allegation is not completed within one year of the public agency's discovery . . . of an act, omission, or other misconduct." (*Ibid.*)

*Mays v. City of Los Angeles* construed section 3304, subdivision (d) of the Act to require completion of the investigation and notification to the officer within one year of discovery of the misconduct. (*Mays v. City of Los Angeles, supra,* 43 Cal.4th at pp. 321–322.) *Mays* found this interpretation most consistent with the purpose of the limitation provision, which is to ensure that an officer will know within one year of the agency's discovery of the officer's act or omission that it may be necessary for the officer to respond in the event he or she wishes to defend against possible discipline.

However, the rights and protections of the Act only apply to public safety officers. (*Haight v. City of San Diego* (1991) 228 Cal.App.3d 413, 417–418 [278 Cal.Rptr. 334]; *Bell v. Duffy* (1980) 111 Cal.App.3d 643, 648–649 [168 Cal.Rptr. 753].) Here, Melkonians was not a public safety officer between the dates of August 27, 2003, and July 15, 2004. Thus, he was not entitled to the protection afforded by the Act during that interval. The retroactive reinstatement did not alter the fact he was not a public safety officer during the period of his discharge.

■ Additionally, Melkonians refused to participate in an interview and his counsel advised the Department it could consider him unavailable. This provided another basis on which the trial court properly could conclude the Act did not apply to Melkonians. Government Code section 3304, subdivision (d)(5), provides the one-year statute of limitations does not apply "[i]f the investigation involves an employee who is incapacitated or otherwise unavailable."

In sum, both of the trial court's findings relative to the timeliness of the Department's proceedings against Melkonians are supported by the evidence. We therefore need not address the other grounds on which the Department urges the notice of termination was timely.[9]

---

[9] The Department asserts the statute did not run because the city attorney indicated the criminal case against Melkonians would remain open until the criminal statute of limitations expired on March 7, 2006. (Gov. Code, § 3304, subd. (d)(1) ["If the act, omission, or other allegation of misconduct is also the subject of a criminal investigation or criminal prosecution, the time during which the criminal investigation or criminal prosecution is pending shall toll the one-year time period."].)

## DISPOSITION

The order denying Melkonians's petition for writ of mandate is affirmed. The Department shall recover its costs on appeal.

Croskey, J., and Kitching, J., concurred.

Appellant's petition for review by the Supreme Court was denied August 26, 2009, S174686.

---

The Department also contends Government Code section 3304, subdivision (d), does not require personal service of a notice of discipline. Rather, it requires the Department to "notify" a public safety officer of the proposed discipline within the one-year limitation period. Thus, the Department adequately complied with the Act by mailing the notice of termination dated May 13, 2003, to Melkonians's last known address.