Filed 7/9/15  Johnston v. City of L.A. CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| KEVIN JOHNSTON, | B256396 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BS139869) |
| v. | |
| CITY OF LOS ANGELES et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Luis A. Lavin, Judge.  Affirmed.

Fullerton & Hanna and Lawrence J. Hanna for Plaintiff and Appellant.

Michael N. Feuer, City Attorney, and Paul L. Winnemore, Deputy City Attorney, for Defendants and Respondents.

Appellant Kevin Johnston was discharged from his position as a Los Angeles Police Department (L.A.P.D. or Department) officer after a Board of Rights (Board) found him guilty of two counts of misconduct: (1) writing an inaccurate report, and (2) making false statements during an official investigation. Johnston filed a petition for administrative mandate in the trial court, alleging, inter alia, that the weight of the evidence did not support the Board's conclusions. The trial court denied Johnston's petition, and he appeals its ruling. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

1. *The traffic stop and seizure of marijuana*

Officers Johnston and Howard Lu worked in the L.A.P.D.'s Hollywood division. On February 15, 2011, the officers were assigned to work together for the first time. Johnston had been an L.A.P.D. officer for approximately five years.

At approximately 9:10 a.m., the officers were on patrol in West Hollywood, with Johnston driving. They observed a Honda Civic driven by Dilzia Newman. After determining that the vehicle's registration was expired, the officers pulled the Honda over. Alphnia Boone, Newman's fiancée, was a passenger in the Honda. Johnston approached the driver's side, discussed the expired registration with Newman, and returned to the police car. Lu then issued Newman a citation for the expired registration, while Johnston moved to the vehicle's passenger side, acting as the "cover" officer. Johnston told Boone he smelled marijuana in the car. Boone volunteered that she was in possession of marijuana. Johnston ordered Boone out of the car, handcuffed her, issued her a citation for marijuana possession, and released her. She remained handcuffed for approximately 30 minutes. Johnston seized a prescription-style bottle containing marijuana from Boone.

2. *The citizen complaint and investigation*

While the foregoing facts were undisputed, Johnston's treatment of Boone during the stop, and the circumstances of his seizure of the marijuana, were not. After the traffic stop, Johnston prepared a "property report" documenting the incident. It stated in pertinent part: "I contacted the front passenger who advised me that she was in

2

possession of a small amount of marijuana.  The passenger then produced an orange plastic bottle from her left front pants pocket containing less than one ounce of marijuana.  I recovered the bottle from her and cited her" for possession of less than 28.5 grams of marijuana, an infraction.  (Health & Saf. Code, § 11357, subd. (b).)  Johnston "held the marijuana as evidence" and booked it at the Hollywood station.

Within an hour of the traffic stop, Boone and Newman went to the Hollywood L.A.P.D. station to complain about Johnston's treatment of Boone.  According to Boone's subsequent testimony at the Board hearing, Johnston, among other things, conducted a pat search of Boone's person while she was handcuffed, including her breast and thigh area, and remarked that she did not "feel like a man."  He retrieved the marijuana container from her pocket while she was handcuffed.

L.A.P.D. Internal Affairs Detective Christina Frus investigated Boone's allegations of biased policing and discourtesy.  Frus interviewed Johnston, Boone, Newman, and Lu.  As a result of Frus's investigation, the allegations of biased policing and discourtesy were apparently determined to be unfounded, but Johnston was charged in a formal complaint with two counts:  writing an inaccurate report while on duty on February 15, 2011, and making false statements to Frus during the official investigation.

3. *The Board of Rights hearing and Johnston's discharge*

Johnston's Board of Rights hearing[1] commenced on July 16, 2012.  The following evidence was adduced at the hearing.

---

[1]     A " 'Board of Rights' is an administrative tribunal charged under the Los Angeles City Charter . . . with the adjudication of charges of police officer misconduct.  [Citation.]  At the conclusion of a Board of Rights hearing, the board is required to make a finding of 'guilty' or 'not guilty' on each charge and to prescribe, for any positive finding of misconduct, a penalty from a specified range of disciplinary options including reprimand, suspension, demotion, and dismissal.  [Citation.]  The Los Angeles Chief of Police . . . has the discretion to accept or reduce, but not to increase, any punishment recommended by the Board of Rights.  [Citation.]" (*Mays v. City of Los Angeles* (2008) 43 Cal.4th 313, 317.)

3

a. *Boone's testimony*

Boone testified as follows.  She saw the officers stopping another car, and made eye contact with Johnston.  The officers then pulled Newman's car over.  Johnston asked Boone for her identification,  and Boone ignored him.  When Johnston repeated his request, Boone asked why he needed her information.  Johnston replied, " 'Because I said so.' "  Boone gave him her driver's license.  When Johnston returned to the passenger side window, Boone asked for her license back.  Johnston replied that he would return it when he was ready, and asked Boone if she had " 'an attitude.' "  He told her she "should learn how to talk to men."  After some additional discussion along the same lines, Boone rolled up her window.  Johnston knocked on the window, asked why Boone was "harassing" him, and queried, " 'Well, did I harass your wife when I smelled weed in the car[?]' "  Boone volunteered that she had medical marijuana in her pocket, and touched her left pants pocket.  Johnston told her to exit the car and placed her in handcuffs. Boone was upset and agitated, and may have responded with profanity.  Johnston then conducted a pat search of the outside of Boone's clothing, including her breast and thigh area, and stated that she did not "feel like a man."  Johnston did not detect the marijuana during the search, and Boone told him it was in her pocket.  Either Lu or Johnston then retrieved the bottle from her pocket.  Boone did not remove the marijuana from her pocket while she was seated in the car, and did not place it anywhere within the interior of the car.  She never handed the marijuana container to Johnston.  However, she did reach into her pocket and remove a medical marijuana recommendation form while seated in the car.

b. *Newman's testimony*

Newman testified that after Boone volunteered she was in possession of medical marijuana, Johnston ordered Boone out of the car, handcuffed her, and conducted a pat search of Boone's waist or pocket area.  Newman saw Johnston reach into Boone's left pants pocket and retrieve the marijuana bottle.  Boone did not place the marijuana on the car's center console or give it to Johnston before getting out of the car.  Newman did not

4

see Johnston pat search any part of Boone's body except the pocket area from which the marijuana was recovered.

        c. *Lu's testimony*

Officer Lu testified that after he issued Newman the citation for the expired registration, Boone became "belligerent" and stated that she had medical marijuana in her possession. When Johnston asked her to step out of the car, Boone swung her arms and cursed. Lu did not see Johnston conduct a pat search of Boone, except to pat her left front pocket, from which Johnston retrieved the marijuana container. Lu did not see Johnston pat Boone's breast area, or any other area of her body. Johnston had already handcuffed Boone outside the car when Johnston retrieved the marijuana container from her pocket.

        d. *Frus's testimony and Johnston's interview*

When Frus interviewed Boone, Newman, and Lu, all three stated that Johnston had recovered the marijuana from Boone's pants pocket.

Frus conducted a recorded interview of Johnston on July 15, 2011, five months after the traffic stop.[2] During the interview, Johnston stated that while Boone was still seated in the car, she either pointed to the marijuana in the car or told him where it was in the car. She did not hand it to him. He had Boone exit the car, handcuffed her when she became uncooperative, and then retrieved the marijuana from the car. When Frus asked whether it was possible that he had retrieved the marijuana from Boone's pocket, Johnston replied, "From what I remember, I got it from the car." He unequivocally denied doing a pat-search. When Frus asked whether he was "positive" he did not retrieve any marijuana from Boone's person, Johnston replied: "From what I remember, I got the marijuana just from the car. Other than that, I don't remember."

During the interview, Frus realized that Johnston had completed the written property report. She retrieved it and Johnston reviewed it. When the interview resumed, Johnston indicated that the report had refreshed his memory. Based on his refreshed

---

[2]      A transcript of the interview was admitted into evidence at the hearing.

recollection, he stated: "when I contacted the passenger, I walked up to the passenger side door, where I could smell the marijuana. I asked if there was marijuana in the car, and she said yes. And then at that point she reached into her left front pants pocket and produced an orange plastic bottle containing what appeared to be marijuana. At that point I told her something along the lines of 'just set that down and then . . . go ahead and step out to the sidewalk.' " Detective Frus asked: "So with all the information now, are you absolutely positive that you did not give her a pat-down and that you did not reach in her pocket to retrieve the marijuana?" Johnston answered, "Yes."[3]

e. *Johnston's testimony at the Board of Rights hearing*

At the Board hearing, Johnston testified that he smelled marijuana in the car and asked Boone about it. Boone replied that she had marijuana and showed him the bottle. He told her to set it down. He had Boone step out of the car and stand by a wall. She was agitated, loud and somewhat uncooperative, so Johnston handcuffed her. Johnston acknowledged that he had told Frus he retrieved the marijuana from the Honda, but after reviewing the statements of the other witnesses in preparation for the hearing, he believed it was "more than likely" that he patted Boone's left front pocket, reached into the pocket, and seized the marijuana. However, he still did not recall doing so. His recollection at the hearing was that Boone did reach into her pocket and show him the marijuana bottle while she was seated in the car; however, he presumed she must have put the container back in her pocket. He told the truth during the Frus interview based on his recollection at the time, but was mistaken. He denied performing a pat-search of Boone.

---

**3** Johnston denied being rude or discourteous, knowing of either Newman's or Boone's sexual orientation, referring to Newman as Boone's wife, asking whether Boone had an attitude, stating that Boone did not "feel like a man," referencing Boone's sexual orientation, or stating that she was harassing him. Neither Boone's nor Newman's race or sexual orientation were a factor in his decisions to make the traffic stop or issue the citation.

f. *Evidence regarding Johnston's knowledge of Boone's complaint*

Boone and Newman both testified that after the traffic stop, they went to the Hollywood L.A.P.D. station to complain about Johnston.[4]  Boone testified that they arrived at the Hollywood station 45 minutes to an hour after the traffic stop.  Boone told the person behind the counter, " 'I was just cited a ticket . . . and . . . I believe that I was assaulted by the police officer' " who had given her the citation.  She asked to speak to a watch commander.  The person behind the counter giggled, walked to the back, returned to the counter, and told Boone and Newman that "he was here to entertain [them.]"  Boone, who was "livid" at this point, replied: " 'Oh, so you think it's entertaining . . . that you have male police officers rubbing down female openly gay people telling them how their body don't feel like a man."  She asked for his serial number.  He walked away from the counter and returned moments later.  He apologized and told her, " 'they want us to take a statement from you, but it has to be recorded.' "  Boone stated she did not trust him, refused to provide a recorded statement, and left.  Given the foregoing, Boone was under the impression she did not actually make a complaint at the Hollywood station.  She therefore contacted the Office of the Inspector General later that day to complain.

Both Boone and Newman testified that they saw Johnston at the Hollywood station while they were making the complaint.  Either Johnston or another officer gave Boone a receipt for the seized marijuana while she was at the station.

In fact, a complaint was taken at the Hollywood station.  The parties stipulated that Sergeant Montelibano completed a preliminary intake form regarding Boone's complaints.  It stated that on February 15, 2011, at approximately 11:30 a.m., Boone spoke to Montelibano at the Hollywood station front desk.  Boone complained that "Officer Johnston was discourteous during the entire incident.  When complainant asked for her identification back from Officer Johnston, he stated, 'I'll give back your identification when I want to give it back to you.'  Complainant was upset that Officer

---

[4]    Boone testified that they initially went to a sheriff's station, mistakenly believing that Johnston and Lu were deputy sheriffs.  Personnel at the sheriff's station informed the women that they could make a complaint at the L.A.P.D. station.

Johnston, being a male officer, conducted a pat down search on her." After completing the complaint form, Montelibano notified Johnston and Lu that a complaint had been made about the traffic stop.

Lu testified that after the officers returned to the station, between 10:20 a.m. and 12:20 p.m. a supervisor notified him that Boone and/or Newman were alleging Johnston committed misconduct during the traffic stop. Lu did not recall whether Johnston was present during the conversation with the supervisor. Lu saw Boone at the station and believed she was making a complaint, because she had stated during the traffic stop that she was going to make a complaint.

Johnston did not recall speaking with a sergeant regarding Boone's complaint, but a log entry indicated he spoke with him on the telephone. He admitted seeing Boone at the Hollywood station, but did not recall whether he saw her before or after he wrote the property report.

g. *The Board's ruling and Johnston's discharge*

The Board unanimously found Johnston guilty of both counts. It concluded that the property report was "vague and inaccurate as to [the] location of the property at the time of recovery" and was "inaccurate as to the actual process of the recovery of the evidence . . . ." The Board reasoned that the only interpretation of the property report was that Boone removed the bottle from her pants pocket and handed it to Johnston. Yet Johnston repeatedly made statements to Frus that contradicted the property report, and his account at the hearing contradicted the property report and his earlier statements to Frus. The Board rejected the argument that Johnston simply made a mistake. "Had this matter gone to a court of law the potential for false testimony by Officer Johnston could have posed liability for the City and the Department, and he would have in essence committed perjury."

As to count 2, which the Board considered to be "the most serious," the Board found Boone, Lu, and Newman credible in regard to where the marijuana was located. It found "Officer Johnston's credibility has been challenged by the inconsistent statements provided during this hearing, and in his attempt to change his statement to fit the

8

overwhelming testimony given by witnesses." Johnston had been given the opportunity to clarify where he located the marijuana but failed to do so, and provided no credible reason for the contradiction between his description of the incident and that of the other witnesses. Johnston had acknowledged that his statements to Frus during the investigation were inaccurate. His attempt to correct his statements "only after he heard the witnesses' testimony and reviewed the documents" did not constitute the correction of a falsity and "in fact further erode[d] his credibility." The Board therefore concluded Johnston made false statements that amounted to misconduct within the meaning of the relevant provisions of the Department's policy manual.

After considering Johnston's otherwise positive employment history, which included numerous commendations and no sustained personnel complaints, and the favorable testimony of a character witness, the Board recommended that Johnston be discharged. Pointing to the Department's "core value of integrity" and the requirement that officers demonstrate " 'honest, ethical behavior,' " the Board concluded that Johnston's words and actions "failed to meet the trust. His actions whether intentional or not, not only damaged his credibility and usefulness as an individual officer, but also damage[d] the integrity of the Department."

Chief of Police Charlie Beck adopted the Board's penalty recommendation and ordered Johnston discharged effective March 10, 2012.

4. *Denial of Johnston's petition for administrative mandamus and appeal*

On October 17, 2012, Johnston filed a verified petition for a peremptory writ of mandate pursuant to Code of Civil Procedure section 1094.5, challenging his discharge. He argued, inter alia, that the weight of the evidence failed to support either count.[5] He sought issuance of a writ of mandate requiring the Board's decision to be set aside and ordering restoration of his employment and reimbursement for lost wages.

---

[5]    Johnston also argued that the Board abused its discretion because the penalty of removal was "a radical departure from recent past discipline for similar or more severe conduct of other officers charged with analogous" misconduct. Johnston does not advance this argument here, and we do not consider it.

9

On March 18, 2014, the trial court denied Johnston's petition. Exercising its independent judgment, the court concluded the weight of the evidence supported the Board's findings. As to count 1, the court rejected Johnston's argument that the report was accurate. The court explained: "There is no credible evidence in the record that the 'passenger . . . produced an orange plastic bottle from her left front pants pocket' " because none of the witnesses, other than Johnston, testified that Boone "ever removed the marijuana from her pocket" before Johnston recovered it. "At a minimum, the property report is vague and inaccurate as to the location of the marijuana at the time it was recovered by" Johnston. The trial court agreed with the Board that Johnston's "ever-changing accounts of the incident" undercut his credibility, and the Board was justified in not accepting Johnston's version of the incident, given that he did not admit he removed the marijuana until after he heard the other witnesses testify at the hearing.

As to count 2, the trial court rejected Johnston's argument that he did not affirmatively or intentionally make false statements, because he qualified his statements during the interview with the phrase " 'from what I remember' " or similar words. The court reasoned that Johnston repeatedly told Frus he retrieved the marijuana from the car and changed his account after hearing the testimony of other witnesses. Johnston's attempts to qualify his answers did "not shield Petitioner from being found to have made false statements to Detective Frus during an official investigation. This is especially true in light of the fact that Petitioner was provided numerous opportunities by Detective Frus to change his account of how he retrieved the marijuana" but persistently maintained that he did not remove the marijuana from Boone's pocket. The court reasoned that the Board was not required to accept the explanation that Johnston "simply could not correctly recall how the incident occurred."

Furthermore, in the court's view, Johnston did have a motive to write an inaccurate property report and make false statements to Frus. "Given the passenger's testimony that she got to the Hollywood Division station about 45 minutes after the traffic stop, and that the property report was prepared around 11:00 a.m., the Court finds that Petitioner saw the passenger at the Hollywood Division station before he wrote the

10

property report.  In fact, the passenger and Petitioner exchanged words at the station.  Besides seeing the passenger at the station, Petitioner was informed on February 15, 2011 that the passenger had complained he improperly conducted a pat down search to retrieve the medical marijuana.  Specifically, the passenger made a formal complaint because she wanted Petitioner's supervisor to know that Petitioner had improperly patted her down for a 'cheap thrill of [her] body, [and] told [her she] didn't feel like a man.'  Further, the passenger testified that Petitioner made comments to her before and during the pat down search that could be construed as homophobic or sexist," including that she had to learn how to talk to men and that she did not " 'feel like a man.' "  Therefore, Johnston's "inaccurate property report and false statements to Detective Frus . . . would protect Petitioner from the passenger's allegations that he committed misconduct in the course of the pat down.  Petitioner's inaccurate property report and false statements would also undermine the passenger's credibility if her complaint was pursued through litigation or the Department's investigation."

Johnston filed a timely notice of appeal from the trial court's ruling.  He contends that the trial court's findings were not supported by substantial evidence.  He urges that the evidence, fairly judged, showed only that he made "mistakes of memory" due to the passage of time, rather than intentional acts of misconduct.  Respondents the City of Los Angeles and Chief of Police Charlie Beck, on the other hand, urge that substantial evidence supported the trial court's findings.

DISCUSSION

1. *Standard of review*

Code of Civil Procedure section 1094.5 governs judicial review by administrative mandate of any final decision or order rendered by an administrative agency.  (*Wences v. City of Los Angeles* (2009) 177 Cal.App.4th 305, 313; *Pedro v. City of Los Angeles* (2014) 229 Cal.App.4th 87, 98-99.)  Where an administrative agency's decision substantially affects a fundamental vested right, the trial court exercises its independent judgment on the evidence.  (*Wences, supra,* at p. 313; *Melkonians v. Los Angeles County Civil Service Com.* (2009) 174 Cal.App.4th 1159, 1167 (*Melkonians*).)  "The trial court

11

must not only examine the administrative record for errors of law, but must also conduct an independent review of the entire record to determine whether the weight of the evidence supports the administrative findings." (*Wences, supra,* at p. 313; *Melkonians, supra,* at p. 1167.) Because the termination of Johnston's employment affected a fundamental right, the trial court here properly exercised its independent judgment in rendering its decision. (*Wences, supra,* at pp. 314, 316; *Melkonians, supra,* at p. 1167.)

We review the trial court's decision for substantial evidence. (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 824; *Pedro v. City of Los Angeles, supra,* 229 Cal.App.4th at p. 99; *Melkonians, supra,* 174 Cal.App.4th at p. 1168.) Substantial evidence is that which a rational trier of fact could find to be reasonable, credible, and of solid value. (*Pedro v. City of Los Angeles, supra,* at p. 99.) We view the evidence in the light most favorable to the judgment, resolve all conflicts in the evidence in favor of the party that prevailed below, and accept as true all evidence tending to support the judgment, including facts that reasonably can be deduced from the evidence. (*San Diego Unified School Dist. v. Commission on Professional Competence* (2013) 214 Cal.App.4th 1120, 1141-1142; *Pedro v. City of Los Angeles, supra,* at p. 99; *Melkonians, supra,* at p. 1168.) The trial court has discretion to make its own credibility determinations, but cannot act arbitrarily or capriciously; "there must be some basis in the record for disbelieving the witness's testimony." (*Morrison v. Housing Authority of the City of Los Angeles Bd. of Comrs.* (2003) 107 Cal.App.4th 860, 868 (*Morrison*).) We must sustain the trial court's factual findings if supported by substantial evidence. (*San Diego Unified School Dist. v. Commission on Professional Competence, supra,* at p. 1142; *Jackson v. City of Los Angeles* (2003) 111 Cal.App.4th 899, 902.)

2. *The trial court's findings were supported by substantial evidence.*

a. *The property report*

Substantial evidence supports the trial court's finding that the property report authored by Johnston was inaccurate. The report stated, in pertinent part: "The passenger then produced an orange plastic bottle from her left front pants pocket containing less than one ounce of marijuana. I recovered the bottle from her and cited her . . . ." Fairly

12

read, the report gave the impression that Boone took the bottle from her own pocket and handed it to Johnston. Based on the evidence at the hearing, this was inaccurate. No witness testified that Boone handed the bottle to Johnston. Rather, both Newman and Lu testified that Johnston retrieved it from Boone's pocket while she was handcuffed.[6] Johnston admitted as much at the hearing. The report omitted any information about Johnston's actions of ordering Boone from the car, handcuffing her, and taking the bottle from her pocket. Johnston prepared the report shortly after the traffic stop occurred, eliminating any concern that the inaccuracy was the result of forgetfulness. The evidence was thus sufficient to show the report was inaccurate.

Johnston avers that because he did, in fact, recover the marijuana from Boone, the report was accurate and consistent with the evidence presented at the hearing. He urges, "[t]he wording of the property report does not specifically spell out when or where Johnston recovered the vial, but the wording of the report is true. Johnston did, in fact, recover the vial of marijuana from Boone." We are not convinced. Even though the report was not affirmatively or expressly inaccurate in this respect, the report's omissions, coupled with the material that was included, gave a false sense of what transpired.

Johnston further contends that the "extraneous statement" that Boone removed the bottle from her pants pocket before Johnston seized it "is of little consequence and does not detract from the ultimate fact that the marijuana was recovered from Boone." We disagree. The statement was not extraneous; it gave the false impression that Boone handed over the bottle, therefore potentially shielding Johnston from allegations he conducted an improper pat search.

Nor are we persuaded by Johnston's argument that the evidence showed Boone did produce the bottle from her pants pocket, as stated in the report. Johnston testified at the hearing that Boone pulled the bottle from her pocket and displayed it before she

---

**6** As noted, Boone could not recall whether Johnston or Lu actually took the bottle from her pocket.

13

exited the Honda, and then presumably replaced it in her pocket. He points out that Boone testified she removed a document from her pocket while in the Honda, but neither Lu nor Newman mentioned seeing her do so; therefore, she could have pulled out the marijuana bottle and displayed it to Johnston without the other witnesses noticing. But Boone testified she did not remove the bottle from her pocket, and the trial court's assessment that she was credible, while Johnston was not, was supported by substantial evidence. (See *Morrison, supra,* 107 Cal.App.4th at p. 868 [in exercising its independent judgment, the trial court has the power to make its own determinations as to witness credibility].) Boone's account that she did not pull the bottle from her pocket was corroborated by the testimony of Newman and Lu that they did not see her do so. Johnston, on the other hand, changed his story several times. (*Ibid.* [factors that weigh on witness credibility include the making of a statement inconsistent with the witness's hearing testimony].) We cannot say the trial court's credibility determination was arbitrary or capricious. (*Ibid*.)

Johnston also complains that both the trial court and the Board found the evidence showed his report was " 'vague and inaccurate,' " whereas he was only charged with writing an " 'inaccurate' " report. Johnston is correct, but his contention does not warrant relief. Based on the record, it is apparent the point made by both the Board and the trial court was that the report was so vague, in its omission of key facts, as to be inaccurate. Moreover, both the Board and the court found the report was vague *and* inaccurate, not simply vague.

b. *The false statements to Frus*

The trial court's conclusion that the evidence showed Johnston made a false statement during an official investigation was likewise supported by the evidence. The manual of the Los Angeles Police Department, volume 3, section 828, which was entered into evidence, defines false statement as follows: "A false statement is any manner of communication, including but not limited to oral, written and electronic, which a Department employee makes when he or she knew or should have known the statement was false at the time it was made or the employee fails to correct the statement upon

learning of its falsity." Here, Johnston repeatedly told Frus that he retrieved the marijuana from the Honda. As discussed, the evidence at the hearing showed this was untrue. The evidence thus supported the trial court's findings.

Johnston urges that the weight of the evidence did not demonstrate he *knowingly* made false statements to Frus. The crux of his argument is that at the time of the interview, he had "*virtually no memory*" of the incident, and repeatedly qualified his answers with "I suppose," "I might have," "I think," "probably," "from what I remember," or similar words. (Original italics.) He points out that the Frus interview transpired on July 15, 2011, five months after the traffic stop. He stated in the interview that the stop had "seemed like a normal stop" and nothing caused it to stand out in his mind. He notes that Frus, at the Board hearing, observed: "It's a traffic stop. I don't expect the officers to remember all the details . . . ." When questioned about her failure to note certain inconsistencies in Lu's account, Frus stated, "If you were to point out every single statement, it would be nothing but inconsistencies in a report. As an investigating officer, I try to point out the main ones that are in reference to the specific allegations." Johnston also points out that Newman, Lu, and Boone had an admittedly hazy recollection of certain facts,[7] apparently in an attempt to suggest that his failure of recollection was understandable and unintentional. He argues that many times during the Frus interview, he stated he was unsure of various details about the stop.[8]

---

[7] Lu, for example, told Frus in his interview that he only ran Newman's identification information through the computer, whereas a report suggested he had run both women's information; Boone recalled the marijuana container was removed from her pocket by one of the officers, but was not sure which one; and Newman did not recall whether or not she told Johnston she knew why he had stopped her car.

[8] For example, Johnston told Frus he was unsure whether he or Lu first noticed the expired registration; did not know whether the Honda's windows were tinted or whether they were up or down; could not recall the precise nature of his conversation with Lu before they pulled the Honda over; could not recall the precise nature of his conversation with Newman, whether she handed him her insurance paperwork, or whether she discussed her smog certificate with him; did not remember the color of the marijuana pill container, whether it had a label, or whether Boone told him she had "paperwork for prescription marijuana"; did not recall how Boone was dressed, except that she may have

15

We are not persuaded.  First, the record does not bear out the contention that Johnston had  "virtually no memory" of the traffic stop at the time of the Frus interview.  To the contrary, the record demonstrates he adequately recalled the incident.  When asked to give a narrative account of what transpired, he readily did so.[9]  Moreover, he was able to recall many details about the incident.[10]  While Johnston was unable to recall some details, the record does not suggest he was simply guessing or was entirely unable to recall the circumstances of the stop.  When he lacked sufficient recall to allow him to answer a question, he did not hesitate to say he did not remember.

---

been wearing baggy clothing; and did not recall what businesses were in the area of the stop.

[9]  Johnston stated: "I believe we were in the area of Highland and Santa Monica, going southbound.  We observed a vehicle, which was a '93 Honda Civic, red, had expired registration.  It was in front of us, heading southbound.  For that violation, my partner and I decided to conduct a traffic stop . . . [¶]  The vehicle pulled over in the area of Santa Monica and Orange. . . .  My partner contacted the driver, obtained her driver's license.  I contacted the passenger.  Upon contacting the passenger in the vehicle, I smelled a strong odor of marijuana emitting from inside the vehicle.  I asked the passenger if there was any marijuana in the car.  She said yes.  She pointed to where it was, either in the center console or somewhere in that area.  I then got her I.D. and had her step out of the car.  [¶]  And I believe my partner ran both of their identifications through our computer.  And then he cited the driver for the expired registration.  And then I cited the passenger for the marijuana, less than one ounce, and recovered it.  And she signed the citation and – actually they both signed their citations and basically got back in their car, and they left."  Later he clarified that he initially contacted the driver, and later moved to the passenger side.

[10]  For example, Johnston unequivocally recalled that on February 15, 2011, he was assigned to patrol car 6A49; he did not make eye contact with the occupants of the Honda when he first observed them; the Honda turned right on Santa Monica Boulevard; he could not see who was in the Honda and did not notice their race or gender until they pulled over; when he asked whether Boone had marijuana, she replied " 'Yeah, it's right here' "; Boone did not hand him the marijuana; he told Boone he would return her license by stating " 'I'll give it back to you when I'm done' "; he never used the word "wife"; and he corrected Lu when Lu incorrectly told Newman that the officers had discretion to seize the marijuana or not.

16

Second, substantial evidence supported the trial court's conclusion that Johnston's use of phrases such as "I suppose," "from what I remember," "probably," and the like, did not indicate only an innocent misrecollection of the facts. The trial court found that in light of the other witnesses' testimony, Johnston's repeated statements to Frus that he did not remove the marijuana from Boone's pocket, his unequivocal statement to the same effect after reviewing the property report, and his failure to correct his account despite opportunities to do so, the Board was not required to accept Johnston's explanation that he could not correctly recall how the incident occurred. The trial court did not err. Even assuming arguendo that the qualifier "from what I remember" excused some of Johnston's statements, after reviewing the property report during the Frus interview Johnston unequivocally stated he was "absolutely positive" he did not reach into Boone's pocket to retrieve the marijuana.

Moreover, whether Johnston knew or should have known his statements to Frus were false, or whether he simply had an innocent failure of memory, was at heart a credibility question for the trial court. Johnston gave three inconsistent accounts of how he retrieved the marijuana. In the property report, he implied Johnston handed him the bottle while seated in the car. In the Frus interview, Johnston stated he retrieved the marijuana from the car after Boone was handcuffed outside the car. And at the hearing, he stated that she showed him the bottle in the car, but he retrieved it from her pocket outside the car. Johnston prepared the property report shortly after the traffic stop, but it too was incorrect, suggesting he intended to provide false information from the start. Finally, as discussed *post*, Johnston had a motive to mischaracterize the stop in order to undercut Boone's allegation that he improperly pat searched her. Substantial evidence thus supported the trial court's credibility finding. (See generally *Morrison, supra,* 107 Cal.App.4th at pp. 867-868.)

Johnston posits that the other witnesses' testimony was, in fact, inconsistent. Therefore, he urges, the trial court erred by basing its credibility finding on the incorrect assumption that the other witnesses' accounts were consistent. He points out that neither Lu nor Newman supported Boone's allegation that Johnston pat searched her breast or

17

thigh area; Boone could not recall which officer actually retrieved the marijuana from her pocket; and Boone thought the officers were sheriff's deputies, not L.A.P.D. officers. But the trial court's point was that none of the witnesses supported Johnston's account that he retrieved the marijuana from the car, and their testimony was consistent in this regard. Moreover, Johnston himself admitted at the hearing that he most likely retrieved the marijuana from the pocket.

Johnston also complains that the circumstances of the recovery of the marijuana were not relevant at the time of the Frus interview. He avers, "the misstatements made by Johnston during his interrogation were immaterial and irrelevant to the allegations at the time and ultimately had no relevance to the legality or propriety of Johnston's actions in seizing the marijuana and citing Boone." To the extent Johnston intends to argue the circumstances of the seizure were unimportant, and therefore he was less likely to have an accurate recollection, we disagree. At the time of the interview, Frus was investigating allegations of biased policing and discourtesy, which apparently were determined to be unfounded. However, Boone's allegations of bias and discourtesy were based on Johnston's conduct during the stop, including the seizure of the marijuana. Thus, the nature of his interaction with her, including the circumstances of the seizure of the marijuana, was directly at issue and highly relevant at the time of the interview.

Johnston next argues that the Department's manual defines misleading statements as those in which relevant information is intentionally withheld or given in an inaccurate context, or which are designed to lead an investigator or others astray. From this he reasons that for a statement to be considered false or misleading the employee must have known that his statements were false *and* intended to mislead the investigator. He urges that because he lacked memory of the incident, he could not have intended to mislead Frus. But he was not charged with making misleading statements; he was charged with making false statements, and the departmental manual's definition of "false statement" does not include the requirement that the employee intended to mislead. Even if such a requirement is implied, as we have discussed the trial court was not required to accept Johnston's argument that he had an innocent failure of recollection.

18

Johnston next avers that he "corrected his statement upon learning of its inaccuracy as required by [L.A.P.D.] policy." He complains he could not have been expected to clarify where he located the evidence until he became aware, at the hearing, that he had been mistaken. But this argument is circular: it presumes that Johnston's misstatements to Frus were due to a failure of memory. The trial court was not required to accept this premise.

c. *Substantial evidence supported the trial court's finding that Johnston had a motive to lie*

Johnston contends the trial court's ruling was erroneous because it was based in part on the faulty conclusion that he had a motive to falsify the report and make false statements. As noted, the trial court found Johnston had a motive to misstate the circumstances of his encounter with Boone in order to protect himself from her allegations that he committed misconduct during the pat search. Johnston argues that there is "absolutely" no evidence he was informed of the nature of Boone's complaint before he wrote the property report or made the statements to Frus, and therefore could not have made false or inaccurate statements to protect himself from allegations of which he was unaware. In support, he avers that neither Boone's complaint, the "Sergeant's Daily Report," nor Montelibano's stipulated testimony mentioned an improper search; Boone testified she *intended* to complain at the Hollywood station, but believed she was unsuccessful in actually doing so; and the first time Johnston could have been aware of Boone's allegation that he improperly touched her was at the Board hearing, many months after the report was written and his statements were made.

Johnston is correct that some of the language cited by the trial court – for example, Boone's assertion that Johnston "just basically had free, cheap thrill of my body," and told her she should learn how to talk to a man -- may not have been conveyed to Johnston prior to Boone's testimony at the hearing. However, he is incorrect that he must have been unaware Boone complained about the pat search. The "Complaint Form" completed by Sergeant Montelibano stated in pertinent part: "Complainant stated that on February 15, 2011 at approximately 0920 hours, she and her girlfriend (Witness-

19

Newman) were stopped by Officer Johnston . . . and Officer Lu . . . for a California Vehicle Code violation. . . . [¶] . . . Complainant stated that Officer Johnston was discourteous during the entire incident. When complainant asked for her identification back from Officer Johnston, he stated, 'I'll give back your identification when I want to give it back to you.' *Complainant was upset that Officer Johnston, being a male officer, conducted a pat down search on her*." (Italics added.)

It was stipulated that after completing the complaint form, Montelibano contacted Johnston and Lu and notified them "that a complaint had been made for the traffic stop." Moreover, Boone testified that at the Hollywood station, she told the person at the desk – presumably Montelibano – that she had been "assaulted" by the officer who issued the citation. She also stated, " '[Y]ou think it's entertaining that you have male police officers rubbing down female openly gay people telling them how their body don't feel like a man.' " It is a reasonable inference that Montelibano may have informed Johnston and Lu of Boone's comments when he informed them she had made a complaint. Newman and Boone both testified that they saw Johnston at the station, and both Lu and Johnston admitted they saw the women there. Lu also stated that Boone had said during the traffic stop that she was going to make a complaint.

Further, the stop occurred at approximately 9:10 a.m., and took approximately 40 minutes. After the stop, Boone and Newman went to the sheriff's station and to a court appointment, and then to the Hollywood L.A.P.D. station. According to Boone, they arrived at the Hollywood station 45 minutes to an hour after the traffic stop concluded. Thus, the women arrived at the station to complain between 10:35 a.m. and 10:50 a.m. The property report states it was prepared at 11:00 a.m. Lu testified he was notified of Boone's complaint sometime between 10:20 a.m. and 12:20 p.m. Substantial evidence thus supported the trial court's express finding that Johnston "saw [Boone] at the Hollywood Division station before he wrote the property report." Although the complaint form states Montelibano spoke with Boone at the front desk at approximately 11:30 a.m., it was for the trial court to resolve this conflict in the evidence, and we must uphold its finding if supported by substantial evidence. From the evidence presented, the

20

trial court could reasonably have inferred that at the time he wrote the report, and certainly by the time of the Frus interview, Johnston was aware that Boone had complained about an improper pat search.

DISPOSITION

The judgment is affirmed.  Respondents are awarded costs on appeal.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**




ALDRICH, J.



We concur:




KITCHING, Acting P. J.




EGERTON, J.*

---

*     Judge of the Los Angeles Superior Court, assigned by Chief Justice pursuant to article VI, section 6 of the California Constitution.

21