Filed 1/6/23 Trent v. Fresno County Employees' Retirement Assn. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| CHARLOTTE TRENT,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>FRESNO COUNTY EMPLOYEES'<br>RETIREMENT ASSOCIATION,<br><br>    Defendant and Appellant. | F083056<br><br>(Super. Ct. No. 20CECG02049)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County. Rosemary T. McGuire, Judge.

Baker Manock & Jensen, Kenneth J. Price, Michael J. Fletcher, Craig W. Armstrong, Peter G. Fashing for Defendant and Appellant.

Law Office of William R. Delaney, William R. Delaney for Plaintiff and Respondent.

-ooOoo-

The Board of Retirement of Fresno County Employees' Retirement Association (Board or retirement association) denied Charlotte Trent's application for a service-connected disability retirement. Trent filed a petition for a writ of mandate in the superior court to set aside the Board's determination, which the superior court granted. The Board appealed, contending the superior court erroneously considered hearsay evidence included in the administrative record and that the superior court's decision was not supported by substantial evidence. We reject the Board's contentions and affirm the superior court's judgment.

## GENERAL FACTUAL AND PROCEDURAL OVERVIEW

The following factual and procedural overview is largely excerpted from the superior court's statement of decision.

"As a child, [Trent] had scoliosis with attendant back problems through the age of 14. At that time (1984), she underwent back surgery to have scoliosis rods [Harrington rods] put in place in order to support her spine….

"[Trent] was hired as an Office Assistant with the County of Fresno on November 1, 1999, and was thereafter promoted to Account Clerk, [and] continued to work as such through 2002. Between 2002 and 2004, [Trent] worked in the private sector, and on December 6, 2004, she returned to working at the County on a full-time basis as an Account Clerk, and was employed [at the County Auditor's Office] until she was terminated on June 15, 2015.

"[Trent's] position with the County Auditor's Office was Account Clerk III. The job description includes bookkeeping, record maintenance, review and preparation, posting and adjusting account records, resolving account discrepancies, auditing and verifying charges/fines, report preparation, operating office equipment, obtaining and providing information to/from the public, vendors, and County departments, and training. Additional duties 'may' include translating, assisting in developing/evaluating

2.

bookkeeping processes, assigning/reviewing/coordinating staff work, and general clerical tasks …. This job is considered a 'light duty' position.

"[Trent] was injured on the job on March 8, 2012, in a stairwell of the County Auditor's Office. [Trent] was walking up the stairs from the basement when a man weighing about 200 pounds who was walking on the first floor somehow lost his footing at the top of the stairs and fell downward, colliding with [Trent]. The force of this collision caused [Trent] to fall backwards towards the wall where she struck her 'whole back and head and buttocks and everything' against the wall and suffered a cut lip when the patron's head struck hers. [Citation.] She was transported to Community Medical Center, where she was treated and released. About a month later, she was x-rayed and it was determined that she had suffered transverse process fractures at the L1, L2, and L3 vertebrae.

"[Trent] filed a Worker's Compensation claim as a result of the accident. [Citation.] She received extensive medical treatment from various providers related to debilitating back pain resulting from the workplace injury. This included multiple imaging [studies], various medications, trigger point injections, multiple epidural injections, and in February 2014 she underwent surgery to remove the Harrington rods. While she felt some relief from this, the pain still remained, and she state[d] it has only worsened over time. She had more therapy, additional trigger point injections, and ongoing strong narcotic medications, such as Fentanyl, OxyContin, cyclobenzaprine and gabapentin.

"[Trent] was on medical leave between March 8, 2012 and August 6, 2013, although County records indicate she returned to work four non-consecutive days during that period, including attempting to work on August 5-6, 2013. On August 6, 2013, she again began an approved medical leave of absence due to the on-the-job injury. On November 24, 2014, [Trent] attempted a 'work hardening' program under the direction of [her primary treating physician] Dr. [Tuan] Tran, with the agreement of the County,

3.

whereby she would return to work on a part-time basis – four hours a day, five days a week – with ten-minute breaks every hour. However, she was unable to work even under these restrictions, with the County documenting that she was only at work for the full four hours on 64 of these days, missed the entire day on 60 occasions, and part of the day [on] 6 occasions. The County claimed that she failed to provide a doctor's note for unscheduled absences, as required, for 22 of her absences.

"On June 17, 2015, the County dismissed [Trent] from employment with an Order for Disciplinary Action, outlining the above-mentioned details, indicating that neither she nor her doctor could say when she could return to work [on] a modified schedule, let alone return to full-time work, and setting forth the hardships this was creating for the Auditor/Controller's department….

"On September 3, 2015, [Trent] applied for service-connected disability retirement, which the … Board [of the Fresno County Employees' Retirement Association] denied at a meeting on September 20, 2017, with notice to [Trent] on September 28, 2017. On October 24, 2017, [Trent] requested [an administrative] hearing on the matter. The matter was referred to Referee Pilar Vaile, who presided over an evidentiary hearing [or administrative hearing] on November 5, 2019. On January 27, 2020, [Referee] Vaile issued a detailed 73-page 'Referee's Recommended Decision' in which she recommended that [Trent's] Application for Service-Connected Disability Retirement be granted.

"However, [the Board of the Fresno County Employees' Retirement Association] decided, in accordance with Government Code section 31534 and Section IV.1.ii.2 of the [retirement] association's policy, to require a transcript of the testimony plus all the other evidence received by the Referee, and take such action as it felt appropriate. After doing so, on May 6, 2020, the board, by a unanimous 9-0 vote, approved its Findings of Fact and Decision ('Decision') which rejected the Referee's recommended decision and instead denied [Trent's] application for service-related disability retirement. [Trent] then

4.

filed [a] petition for administrative writ [in the superior court], asking that the court overturn [the board's] Decision and require it to grant her disability-related retirement."

The superior court, Judge Rosemary McGuire, granted Trent's petition for writ of mandate, and ordered "the Board of Retirement of the Fresno County Employees' Association to vacate its decision and to instead grant [Trent's] application for a service-connected disability retirement benefit."

The Board of Retirement of the Fresno County Employees' Association now appeals the superior court's judgment.

## **DISCUSSION**

### I.      The Superior Court's Decision is Supported by Substantial Evidence

#### A.      *Standard of Review Utilized by the Superior Court in Reviewing the Administrative Determination*

The superior court adjudicated Trent's petition for writ of mandate pursuant to Code of Civil Procedure section 1094.5. " 'Code of Civil Procedure section 1094.5 is the administrative mandamus provision providing the procedure for judicial review of adjudicatory decisions rendered' " in an administrative proceeding. (*Paxton v. Board of Administration of the Public Employees' Retirement System* (2019) 35 Cal.App.5th 553, 559; *Poncio v. Department of Resources Recycling & Recovery* (2019) 34 Cal.App.5th 663, 668-669 [" 'Section 1094.5 of the Code of Civil Procedure provides the basic framework by which an aggrieved party to an administrative proceeding may seek judicial review of any final order or decision rendered by a state or local agency.' "].)

When the *trial* court reviews an *administrative decision* pursuant to a petition for a writ of mandate under Code of Civil Procedure section 1094.5 (section 1094.5), it reviews the decision for abuse of discretion. (§ 1094.5.) "Abuse of discretion is established if … the order or decision is not supported by the findings, or the findings are not supported by the evidence." (§ 1094.5, subd. (b).) A trial court uses two alternative standards of review in reviewing an administrative decision in an administrative

5.

mandamus proceeding. The two alternative standards of review are the " 'independent judgment' " standard of review and the " 'substantial evidence' " standard of review. (*Benetatos v. City of Los Angeles* (2015) 235 Cal.App.4th 1270, 1280 (*Benetatos*).)

Here, the superior court applied the "independent judgment" standard of review, hence we will address the applicability and contours of this standard. " 'If the administrative decision involved or substantially affected a "fundamental vested right," the superior court exercises its independent judgment upon the evidence … [and] must examine the administrative record for errors of law and exercise its independent judgment upon the evidence.' " (*Benetatos*, *supra*, 235 Cal.App.4th at p. 1280; *Alberda v. Board of Retirement of Fresno County Employees' Retirement Assn.* (2013) 214 Cal.App.4th 426, 433 (*Alberda*) [the trial court exercises its independent judgment upon the evidence when it reviews an administrative decision that substantially impacts a fundamental vested right].) "Where it is claimed that the findings are not supported by the evidence, in cases in which the court is authorized by law to exercise its independent judgment on the evidence, abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence." (§ 1094.5, subd. (c).)

In carrying out its independent review, "the trial court must afford the [administrative] decision a strong presumption of correctness and must impose upon the petitioner the burden of showing that the [administrative] findings are contrary to the weight of the evidence, i.e., the decision was not supported by the preponderance of the evidence." (*Alberda*, *supra*, 214 Cal.App.4th at p. 433.) " 'Because the trial court ultimately must exercise its own independent judgment, that court is free to substitute its own findings after first giving due respect to the [administrative] findings.' [Citations.] Thus, while the trial court begins its review with a presumption of the correctness of the administrative findings, the presumption is rebuttable and may be overcome by the evidence. [Citation.] 'When applying the independent judgment test, the trial court may reweigh the evidence and substitute its own findings for those of the [administrative

6.

adjudicator], after first giving due respect to the [adjudicator's] findings.' [Citation.] This includes examining the credibility of witnesses." (*Alberda*, *supra*, 214 Cal.App.4th at p. 433; see *Levingston v. Retirement Board* (1995) 38 Cal.App.4th 996, 1000 [trial court independently reviews the administrative record and may reweigh the evidence].) As mentioned, "abuse of discretion is established if the court determines that the [administrative] findings are not supported by the weight of the evidence." (§ 1094.5, subd. (c); *Alberda*, *supra*, 214 Cal.App.4th at p. 433.)

Here, in reviewing the Board of Retirement's administrative decision, the superior court "was authorized to apply its independent judgment as to the weight of the evidence," because "[a] public employee has a fundamental vested right to a disability pension if he or she is in fact disabled." (*Beckley v. Board of Administration etc*. (2013) 222 Cal.App.4th 691, 697.)

## B.     *Legal Framework Utilized by the Superior Court in Rendering its Decision*

Public employee retirement boards have plenary authority regarding, and fiduciary responsibility for, the administration of their retirement systems. (Cal. Const., art. XVI, § 17.) A county's retirement system is administered by a county retirement board, under the County Employees Retirement Law of 1937 (CERL). (Gov. Code, § 31450 et seq.) County retirement systems formed under the CERL provide both service retirements based on age and years of service (Gov. Code, § 31670 et seq.) and disability retirements based on an employee becoming permanently incapacitated for the performance of his or her work duties (Gov. Code, § 31720 et seq.). (See *Flethez v. San Bernardino County Employees Retirement Assn.* (2017) 2 Cal.5th 630, 635.)

"Government Code section 31720 sets forth the requirements for a qualifying County employee to receive service-connected disability retirement benefits." Government Code section 31720 provides: "Any member permanently incapacitated for the performance of duty shall be retired for disability regardless of age if, and only if: [¶]

7.

(a) The member's incapacity is a result of injury or disease arising out of and in the course of the member's employment, and such employment contributes substantially to such incapacity."[1]  (See *Mansperger v. Public Employees' Retirement System* (1970) 6 Cal.App.3d 873 [holding that "incapacity" means the substantial inability of an applicant to perform his or her usual duties, in interpreting the term under Gov. Code, § 21022, which pertains to the Public Employees' Retirement System or PERS].)

In order to qualify for a service-connected disability, it is not necessary for a county employee to show that his or her employment was the sole, or even the primary, cause of the disability.  Instead, the employee need only establish that his or her incapacity arose out of and in the course of employment, and the employment "contribute[d] substantially to such incapacity."  (Gov. Code, § 31720, subd. (a).)  This "substantial contribution" test has been construed to mean that " 'while the causal connection between the [employment] and the disability may be a small part of the causal factors, it must nevertheless be *real* and *measurable*.  There must be substantial evidence of some connection between the disability and the job.' "  (*Bowen v. Board of Retirement* (1986) 42 Cal.3d 572, 578; see *Glover v. Board of Retirement* (1989) 214 Cal.App.3d 1327, 1336-1337.)

A service connection may be found if the claimant's employment aggravated or accelerated a preexisting condition.  (*Kuntz v. Kern County Employees' Retirement Assn.* (1976) 64 Cal.App.3d 414, 421.)  The claimant need not have suffered a traumatic injury or been exposed to stresses beyond what normally would have occurred on the job.  (*Ibid.*)  A service-connected disability will be found if the employee's condition subjects

---

**1**    Government Code section 31720 also specifies other requirements an employee must satisfy in order to qualify for service-connected disability retirement—e.g., the member must have completed five years of service—however, these routine requirements are not at issue in this appeal.

him or her to disability to which a healthier person would be relatively immune. (*Peter Kiewit Sons v. Industrial Acci. Com*. (1965) 234 Cal.App.2d 831, 837.)

### C. Appellate Court Reviews the Superior Court's Decision under the Substantial Evidence Standard of Review

While the trial court is required to independently review the evidence, the standard of review on appeal from the trial court's determination is the substantial evidence test. (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 824 [substantial evidence test applied to disability case].) That is, we must "sustain the trial court's findings if they are supported by substantial evidence." (*Governing Board v. Haar* (1994) 28 Cal.App.4th 369, 378; *Bixby v. Pierno* (1971) 4 Cal.3d 130, 143, fn. 10 ["After the trial court has exercised its independent judgment upon the weight of the evidence, an appellate court need only review the record to determine whether the trial court's findings are supported by substantial evidence."].) Substantial evidence is "relevant evidence that a reasonable mind might accept as adequate support for a conclusion" (*Taylor Bus Service, Inc. v. San Diego Bd. of Education* (1987) 195 Cal.App.3d 1331, 1340-1341), or of " ' "ponderable legal significance … reasonable in nature, credible, and of solid value." ' " (*Ofsevit v. Trustees of Cal. State University & Colleges* (1978) 21 Cal.3d 763, 773, fn. 9.)

However, " '[a] decision supported by a mere scintilla of evidence need not be affirmed on review.' [Citation.] '[I]f the word "substantial" [is to mean] anything at all, it clearly implies that such evidence must be of ponderable legal significance. Obviously the word cannot be deemed synonymous with "any" evidence. It must be reasonable ..., credible, and of solid value....' [Citation.] ... While substantial evidence may consist of inferences, such inferences must be 'a product of logic and reason' and 'must rest on the evidence' [citation]; inferences that are the result of mere speculation or conjecture cannot support a finding." (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633.)

"Applying the substantial evidence test on appeal, we may not reweigh the evidence, but consider that evidence in the light most favorable to the trial court, indulging in every reasonable inference in favor of the trial court's findings and resolving all conflicts in its favor." (*Breslin v. City and County of San Francisco* (2007) 146 Cal.App.4th 1064, 1078; *Barber v. Long Beach Civil Service Com.* (1996) 45 Cal.App.4th 652, 659 [in determining whether substantial evidence supports the trial court's conclusions, "we must resolve all conflicts and indulge all reasonable inferences in favor of the party who prevailed in the trial court"].) "The question on appeal is whether the evidence reveals substantial support—contradicted or uncontradicted—for the trial court's conclusion" that the Board's findings of fact were not supported by the weight of the evidence. (*Breslin*, *supra*, at p. 1078.) "We uphold the trial court's findings unless they so lack evidentiary support that they are unreasonable. We may not uphold a finding based on inherently improbable evidence or evidence that is irrelevant to the issues before us." (*Ibid*; *Wieser v. Board of Retirement* (1984) 152 Cal.App.3d 775, 783 [" '[w]e recognize at the outset these two well-settled principles: (1) factual determinations of the [superior court] must be upheld if there is substantial evidence in their support and the relevant and considered opinion of one physician, though inconsistent with other medical opinions, may constitute substantial evidence' "].)

In sum, in considering the superior court's decision under the substantial evidence standard of review, we "view the evidence in the light most favorable to the judgment and accept as true all evidence tending to support the judgment, including all facts that reasonably can be deduced from the evidence." (*Pedro v. City of Los Angeles* (2014) 229 Cal.App.4th 87, 99 (*Pedro*).) The judgment must be affirmed if, viewed in this light, the record discloses substantial evidence to support the court's conclusion. (See *San Diego Unified School Dist. v. Commission on Professional Competence* (2011) 194 Cal.App.4th 1454, 1461-1462 ["We do not reweigh the evidence." Rather, " ' " '[w]hen more than

10.

one inference can be reasonably deduced from the facts, the appellate court cannot substitute its deductions for those of the superior court.' " ' "].)

We review questions of law de novo. (*Bostean v. Los Angeles Unified School Dist.* (1998) 63 Cal.App.4th 95, 107-108; *Christensen v. Lightbourne* (2017) 15 Cal.App.5th 1239, 1251 [on questions of law arising in mandate proceedings, courts exercise independent judgment, with the superior court and appellate court performing the same functions].) In other words, we apply our independent review without deference to the lower court's rulings. (*Christensen v. Lightbourne*, *supra*, at p. 1251; *Alberda*, *supra*, 214 Cal.App.4th at pp. 433-434 [in an administrative mandamus action, "when the appellate issue is a pure question of law," such as whether the trial court applied the correct standard of review, we review the issue de novo]; *Melkonians v. Los Angeles County Civil Service Com.* (2009) 174 Cal.App.4th 1159, 1168 (*Melkonians*).) In sum, "[a]n appellate court independently determines whether the agency [or tribunal] prejudicially abused its discretion by failing to proceed in the manner required by law, such as by failing to comply with required procedures, applying an incorrect legal standard, or committing some other error of law." (*Pedro*, *supra*, 229 Cal.App.4th at p. 99.)

### D.     *Relevant Evidence in the Administrative Record*

Six witnesses testified at an administrative hearing held on November 5, 2019: Charlotte Trent, Paul Katchadourian (Trent's longtime significant other or partner), Rose Beimeister (Trent's mother), Dr. Tuan Tran (Trent's primary treating physician), Dr. Don Williams (the county's expert physician), and Navjit Puniani (an employee of the Fresno County Auditor/Controller's Officer).

#### (i)     Testimony of Navjit Puniani

Navjit Puniani, an employee of the Fresno County Auditor/Controller's Office testified that she was familiar with, and sometimes took on, the duties of a human

resources liaison for the office. Puniani testified that Account Clerk III is a " 'light physical activity' " position.

### (ii)    Testimony of Charlotte Trent

Charlotte Trent testified on behalf of herself. She was born in 1970 and suffered from scoliosis; in 1984, she had Harrington rods surgically inserted along the length of her spine on account of her condition. On March 8, 2012, Trent suffered an accident in the stairwell at work, when a person fell on her, causing her to hit the wall behind her. She described the accident as follows: "The person fell on me and his head hit my mouth, and his body fell against my whole front and we fell to the bottom of the stairs together. My whole back and head and buttocks and everything hit the back of the wall. His whole body impacted my chest and my whole front. I mean, everything hurt. I mean, it was like a pancake. I don't know how to explain it more clear than that. It was like being sandwiched between a man and a wall." Trent said her back was slammed against the wall.

Trent testified that between 1984, when the Harrington rods were placed in her back, and the accident in 2012, aside from an initial recovery period after the 1984 surgery, she never had any back problems whatsoever. She stated: "It was wonderful. I was like he-woman. Everybody used to call me to help move stuff. It was like I had a bionic back."

After the March 8, 2012 workplace accident, Trent suffered broken bones in her back, was in a lot of pain, and was put on a lot of medication. Trent testified: "I'm on a lot of opiates. I'm on Fentanyl patches, Oxycodone, I mean a strong dose." She noted: "I'm on … so much medication and it's hard to even think … You can't think straight like when you're on a lot of opiates." She said that, in addition to medication, she had undergone massages, physical therapy, epidurals, CT scans, x-rays, and surgery to remove her Harrington rods. Trent tried to return to work, including on a part-time basis, but was not able to function.

12.

Trent was asked how much time during the workday she had to sit, while working in her account clerk position. Trent answered: "Pretty much the whole time unless you had to go file something." Trent explained that, after the accident, she could not sit longer than "half an hour or 45 minutes," because of her back injury. Trent said she continually tried to do her job, but the county fired her.

Trent stated that, based on her condition, she was unable work in her account clerk position; nor did she believe that any other realistic employment option was available to her. Trent further testified that the accident she had at work was the cause of the back injuries and debilitating pain she had suffered and continued to suffer. Her injuries were work related because she was at work when the accident occurred. She timely filed an application for disability retirement in December 2015, as she was incapacitated from performing her duties based on the March 8, 2012 workplace accident.

### (iii) Testimony of Dr. Tuan Tran, M.D.

Dr. Tuan Tran was Trent's primary treating physician. Dr. Tran had consistently been treating Trent since 2014, after the scoliosis rods in her back were removed earlier that year by Dr. Henry Aryan. Dr. Tran saw Trent every four to six weeks. Dr. Tran had taken Trent off work until November 23, 2014. Dr. Tran noted that Trent suffered from muscle spasms and experienced a decreased range of motion; he had diagnosed her with chronic lumbar strain. He testified that multiple physical examinations of Trent that he had conducted supported this diagnosis. He testified: "The difference between her and another person is the muscle of a normal person would be soft. Hers is almost hard as a rock." Dr. Tran said that Trent's lumbar strain would last for the rest of her life. He said that, as a result, she would be in pain for the rest of her life.

Dr. Tran was aware that Trent had worked as an account clerk. Dr. Tran was asked the following question: "If a job requires one to be seated for a long period of time, let's say six hours out of eight hours during a day … would it be your opinion that a chronic strain to the back would impact that job so that a person might not be able to

work." Dr. Tran answered: "Yes." Dr. Tran added that Trent was experiencing headaches as well as back pain, and the headaches were related to her back issues. Dr. Tran explained that upper back issues caused tension headaches in many people. Dr. Tran had prescribed a Fentanyl patch, Percocet, Gabapentin, Cyclobenzaprine, and Norco for Trent; Trent was currently on the Fentanyl patch, Percocet, and Cyclobenzaprine, all of which were necessitated by the pain she was experiencing. Trent's pain had been continuous and ongoing since Dr. Tran started treating her.

Dr. Tran testified that as to the issue of causation or apportionment of causation, he agreed with the opinion of Dr. William Ramsey, M.D., who was the agreed medical examiner in connection with Trent's workers' compensation claim. Dr. Ramsey examined Trent on July 11, 2014 and December 11, 2015, respectively, and issued corresponding reports on September 19, 2014 and February 10, 2016. Dr. Ramsey had opined in his reports that 95 percent of Trent's present condition was attributable to the injury she sustained as a result of the accident on March 8, 2012, and five percent of her condition was attributable to her preexisting spinal issues.

Dr. Tran agreed with Dr. Ramsey's assessment that the accident resulted in the loosening of the scoliosis rods or hardware in Trent's back and that her post-accident back issues would not have been as significant in the absence of the prior work that had been done on her spine. Dr. Tran clarified that Dr. Ramsey was better qualified than Dr. Tran to speak to specific, major orthopedic issues, but Dr. Tran was more qualified to speak to Trent's physical restrictions because he saw Trent much more frequently than Dr. Ramsey, who saw her on only two occasions.

Dr. Tran agreed with work preclusions identified by Dr. Ramsey in his report dated September 2014, specifically that "recommended activity restrictions consist of preclusions from repetitive extreme bending, very prolonged immobility, sitting or driving, [and] heavy lifting, [with] a recommended maximum occasionally to 25 pounds, regularly to 15 pounds." Dr. Tran also agreed that while walking was not a problem,

14.

Trent could not stand for more than an hour, could not sit for more than 30 minutes, had difficulty driving a car, and could not sleep at night without pain medication. Dr. Tran noted Trent was unable to tolerate a limited trial run of returning to work, with "pain and spasm in her upper low back and neck area" that increased over the relevant period. He indicated that, for practical purposes, Trent was unable to work (except in the theoretical sense that a paralyzed person can be said to be employable because that person could theoretically do tasks with his or her mouth). Dr. Tran further observed that, given the significant work restrictions Trent required as a result of her back injury, she was also a difficult candidate for vocational rehabilitation.

Dr. Tran addressed the question whether Trent's condition was "permanent and stationary." He described a "permanent and stationary" condition as one that was not expected to "either get significantly worse or significantly better with treatment." Dr. Tran testified that he was refraining, at that moment, from pronouncing a specific conclusion as to whether Trent's condition was permanent and stationary because he was having difficulties getting approval from her insurance company for certain treatment modalities for her and did not want to close that door by labeling her condition permanent and stationary.

Dr. Tran had prepared a "Treating Physician's Statement," dated December 13, 2015, that was part of Trent's application for a disability retirement ("Part D" of disability retirement application). Dr. Tran's statement was admitted into evidence but neither party questioned him in this regard, despite having the opportunity to do so, during his testimony at the administrative hearing. In the treating physician's statement, Dr. Tran stated that Trent was precluded from prolonged sitting and standing and lifting anything heavier than 10 pounds. In addition, he noted, by checking a box, that Trent was permanently incapacitated from performing her job duties. He further noted, also by checking a box, that there was no treatment that would possibly permit Trent to return to

duty. Finally, he confirmed that Trent was continuously incapacitated from performing her duties from the time of discontinuance of service.

### (iv) Testimony of Dr. Don Williams, M.D.

Dr. Don Williams, who was board certified in orthopedic surgery, had been performing independent medical examinations for the Fresno County Retirement Employees Association for four years. He performed independent medical examinations for purposes of evaluating individuals for disability retirement. Dr. Williams performed an independent medical examination of Trent in 2017 and prepared a report documenting his findings. Dr. Williams was called to testify as an expert witness by the retirement association.

Dr. Williams reviewed the job duties of Trent's account clerk position. He described the position as follows: "I would describe it as light physical activity. It involves primarily lifting light objects, small objects. It's primarily a sitting job, but there's – it didn't specify the amount of time you have to sit. There's walking and standing also. There's some bending and stooping."

Counsel for the retirement association questioned Dr. Williams, in detail, with regard to a range of Trent's prior medical records from her visits with several other doctors, as well as records of various scans Trent had undergone. Counsel for the retirement association moved prior medical records from multiple doctors, into evidence. One of the records that counsel discussed with Dr. Williams was a CT scan of Trent's lumbar spine that showed "non-displaced fractures of the left transverse processes" of the L-1, L-2, and L-3 vertebrae. With regard to the spinal fractures, Dr. Williams testified: "So she had the recent fall [on March 8, 2012 in the workplace], so it's probable that this fracture, these non-displaced fractures are associated with the fall. She has had prior CT scans in the past which didn't mention them, and she had subsequent ones which showed [they] had healed. So the timing is consistent with that it occurred with the injury [from the workplace accident]."

16.

Among other medical records counsel for the retirement association discussed with Dr. Williams, were records from Dr. Henry Aryan from December 2013. Dr. Williams explained that Dr. Aryan believed that removal of Trent's previously implanted scoliosis rods would help to alleviate her back issues. Dr. Williams also discussed Dr. Aryan's operative report from the rod removal surgery in February 2014. Dr. Williams said: "[Dr. Aryan] did a removal of the rods and as much of the sublaminar wiring as he could. He did it from the thoracic four down to the lumbar – I think one, yeah." Dr. Williams also testified that Dr. Aryan had noted a finding of "hardware failure," a reference to the Harrington rods, in his postoperative report. Dr. Williams pointed out that other records showed that Trent's transverse process fractures had healed before the rods were removed. (On cross-examination, Dr. Williams acknowledged that Dr. Aryan believed that, based upon her workplace fall, Trent's scoliosis rods were loosened, and that was part of the reason why he recommended removal. Dr. Williams further acknowledged, on cross examination, that during the surgery, Dr. Aryan found a possible pedicle fracture at T-4.)

The retirement association's counsel and Dr. Williams also discussed in detail and at length, the September 19, 2014 report of Dr. Ramsey, the agreed medical examiner for purposes of Trent's workers' compensation claim. In this regard, Dr. Williams testified: "So [Dr. Ramsey] felt that [Trent's] condition was permanent and stationary. So it was not expected to have major changes in the future. He … noted some light duty restrictions …, then he discussed causation and apportionments." Dr. Williams opined that Dr. Ramsey concluded, in both his September 19, 2014 and February 10, 2016 reports, that Trent should be able to return to work.

As for his own opinion, based on his physical exam of Trent, Dr. Williams stated that he "thought she was not substantially incapacitated," and was able to perform her job. He observed it would be a reasonable thing for her employer to assist with her ongoing pain by allowing her to sit and stand at will, and that potential use of a sit-stand

17.

desk would enable her to alleviate the stiffness in her back (the County had not offered Trent a sit-stand desk).

On cross-examination, Dr. Williams acknowledged that Trent was diagnosed with chronic back pain, that her pain would last for the rest of her life, and the pain amounted to a permanent partial disability. Dr. Williams further acknowledged that before her back surgery, Trent's pain would have been intolerable; he said that according to Trent the surgery "did help remove some of the pain." To the extent her pain was a permanent partial disability, that meant "[s]he has some limitations and hopefully with accommodations she will be able to continue the same job." When asked whether it would be difficult to find gainful employment where an employer would allow her to take opioids, Norco, and other narcotic medications while working, Dr. Williams responded: "Well no, there are a number—I mean, there are jobs you can't do, but there are a number of jobs you can do with opioids." Dr. Williams said Trent could at least work partial days, taking breaks every ten minutes, and with a sit-stand desk, she would not need as many breaks. He acknowledged that Trent had not been successful in returning to work on a limited schedule with frequent breaks, while taking medication.

On cross-examination, Dr. Williams also said he agreed with Dr. Ramsey that Trent's condition was permanent and stationary. He explained that Dr. Ramsey had "indicate[d] that the major surgeries that were going to be done were done, the further treatment was on a conservative basis, that her medical condition has plateaued and reached a maximum medical improvement, not likely to change based on the conservative treatments." He said that, at that point in time, "the pain medication doesn't change her pathology."

On cross-examination, Dr. Williams noted he disagreed with Dr. Ramsey's apportionment of causation with respect to Trent's back injury. Dr. Williams opined: "20 percent industrial and 80 precent non-industrial is what I would rate the apportionment; okay."

18.

### (v)    Paul Katchadourian

Paul Katchadourian was Trent's romantic partner, and had lived with Trent, for 20 years. Katchadourian testified that prior to her March 8, 2012 workplace accident, Trent was extremely energetic and vivacious. After the accident, her situation had been physically and emotionally "overwhelming," with pain and depression as consistent hallmarks. Katchadourian said: "She's always in pain. There's never a time where I can remember her not having any extreme pain."

Katchadourian described Trent's efforts to return to work: "I know the days that she did go to work were the days she felt like she had to be there. It wasn't a day that was a better day. Over a period of time, going to work and sitting at the chair or trying to do the work they were asking, it would build up – the pain would build up where she couldn't go anymore, but it doesn't mean that when she showed up originally to go to work that there was not any pain. It was just – her nature is not to not work. Her nature is not to not be contributing."

Katchadourian explained that Trent's rod removal back surgery did not result in significantly reduced pain levels for Trent. In this regard he also noted: "The doctor called me on the phone after the surgery. [Trent's] mother and her father [were] there and I answered the phone after the surgery, and he told me that he did the best he could do, and that she survived the surgery, which is all that mattered at that point. He said he didn't think that that was the end of it."

Katchadourian observed that Trent did not have to tell him she was in pain because the fact she was in pain was plainly visible. Katchadourian said: "She does not have to tell me verbally. She tells me every time she bends over, every time she is trying to get up off the couch, every time she's reaching for something, every time she is walking downstairs or moving around, every time we go do anything together her physical action is spoken loud and clear. She doesn't need to say it."

19.

Katchadourian observed: "We used to do a lot of things together. We always had a lot of fun, and she was with the County for 13 years. I know she was going to retire there. She told me that. She just got done getting her degree, working full time, and studying at night. That's tough. I can't even do that. I could not do that. But she did prior to the accident so that she can move up in the County and get a better job, right? [¶] That's not – that's not from a person who is looking for a way out. That's a person who is looking to improve her life, improve the company they work for and contribute more. We don't travel. We don't go anywhere. She can't sit in a car long. We don't sleep in the same room anymore because she's in that much pain. She never joins me for dinner when I take my mom out. She's always invited every time. Her joy in life is hearing about other people because she can't do anything."

Katchadourian was asked, as someone who owned his own business and knew Trent well, whether Trent could ever work again. He answered: "Absolutely no way. No possible way [Trent] could work ever gain. That is the experience of knowing her, knowing her will to work, and wanting to work, and not working."

### (vi) Rose Beimeister

Trent's mother, Rose Beimeister, testified at the administrative hearing. Trent and Beimeister lived 30 minutes apart and saw each other at least once a week; they talked on the phone daily. Beimeister said that since the March 8, 2012 workplace accident, Trent had been a shadow of her prior self and was living life as a shut-in. Whereas before the accident, she was very athletic and loved life, now she was debilitated and in constant pain. When asked whether Trent should continue working, Beimeister replied: "She can't make plans for lunch. She can't even make plans to volunteer. She can't make lunch plans. How is she going to work? How is she going to work? Then we have the issue of the medication that they've put her on instead of fixing her that they have her now medicated. How can she work? Who is going to hire her?"

### (vii)   Medical Records:  September 19, 2014 and February 10, 2016 Reports of Dr. William Ramsey

The reports prepared by Dr. William Ramsey, dated September 19, 2014 and February 10, 2016, were offered into evidence as the parties' joint exhibit 13.  Both parties stipulated only as to foundation for all joint exhibits; the board's counsel objected to admissibility of Dr. Ramsey's opinions on hearsay and other grounds.

We will first summarize Dr. Ramsey's report dated September 19, 2014, prepared in connection with Trent's workers' compensation claim (Dr. Ramsey examined Trent on July 11, 2014).  Dr. Ramsey commented on the medical interventions made to alleviate Trent's back condition: "Interventions have included multiple imaging, various medications, trigger point injections, multiple epidural injections without benefit, and in February 2014, she underwent surgery which she indicated helped with some of her pain. Since then, she has had more therapy, additional trigger point injections without benefit, and ongoing medications, currently Fentanyl, OxyContin, cyclobenzaprine and gabapentin.  She indicates that a nerve block has been recommended but denied by the carrier.  She indicates that further trigger point injections have been recommended and possibly more therapy."

Dr. Ramsey noted: "[Trent] was evaluated by Dr. Aryan 10/4/12.  He described multiple fractures (presumably referencing the transverse process injuries, L1, L2, L3), and possible hardware failure ….  Surgical report, 2/3/14, describes removal of [Trent's] Harrington rods and related hardware.  No failure of her former fusion was identified. Postoperative notes describe some improvement in her pain in the thoracic area.  She was referred to physical therapy.  Followup note June 16 describes [Trent] as having benefitted as much as she is likely to from surgery, although suggested considering additional therapy, medications, injection and simply the passage of time."

On the question whether Trent's condition was permanent and stationary, Dr. Ramsey observed:  "Given the passage of time since her injury, the treatment

21.

interventions applied to date, the multiple imaging studies, noting no indications for more aggressive intervention such as surgery and no indication to repeat ineffective injection techniques, her condition can be considered permanent and stationary as of the date of my evaluation."

Dr. Ramsey addressed the requirements of Trent's account clerk job: "Her job as an account clerk involved desk sitting, filing, answering phones, and computer operation. The bulk of her day is spent sitting at a computer keyboard. There is limited stair climbing, reaching, twisting, bending, pushing or pulling, kneeling. She indicates lifting between 5-10 pounds occasionally." He prescribed the following "work preclusions": "Recommended activity restrictions consist of preclusions from repetitive extreme bending requirements, very prolonged immobility, sitting or driving, and heavy lifting with a recommended maximum occasionally to 25 pounds, regularly to 15 pounds."

Dr. Ramsey addressed "causation and apportionment": [Trent] has a prior history of scoliosis, treated surgically as an adolescent with no residual pain complaints. This fusion operation likely has some contribution to her restricted motion on extension, but it is minor in degree. To some extent, her upper thoracic difficulties requiring surgery, are a consequence of a hardware segment that was damaged or loosened in the subject injury, absent which this area of the back would not likely have become troublesome for her. Again, some minor apportionment is felt to be appropriate to this preexisting surgical residual. [¶] After review of the extensive data provided, considering reasonable medical probability, avoiding speculation or guesswork, I recommend apportionment of her residual back condition 95% to the effects of her subject injury of 3/8/12 at work, 5% to the contribution from preexisting spinal changes due to her adolescent surgical procedure."

As for the possibility of Trent returning to work, Dr Ramsey stated: "She indicates she tolerated poorly a brief trial of return to work. Her work is light, mostly sedentary. Persons with back pain frequently tolerate sedentary activities poorly, noting

22.

that stiffness and muscular fatigue and spasm often result. Some degree of movement is more helpful and preferred and recommended. If her work can incorporate frequent breaks from the sitting posture and opportunities to move about without exertional stress beyond that recommended above, another trial of return to work is recommended. If she does not handle this well, then vocational change is recommended, consistent with the restrictions described, including those involving immobility."

Dr. Ramsey reevaluated Trent on December 11, 2015, and prepared a report dated February 10, 2016, on that basis. In the February 2016 report he noted: "[Trent] is now approaching four years post injury. No surgical interventions have been identified. She has had extensive conservative treatment with modest benefit at best. I previously concluded in September 2014, that her condition was permanent and stationary. Despite this, she has undergone further repetitious treatment of the same sorts, basically conservative in nature and involving medication and therapy without appreciable benefit."

Dr. Ramsey added: "I previously concluded her condition was permanent and stationary and see no basis to change my previous conclusions in this regard. I can think of no intervening benefit other than exercise that will help her improve functional status. There are no indications for surgery, injection, or further passive treatment modalities involving such things as massage, manipulation, or therapeutic modalities. Medications may be of some minor symptomatic relief, but will not cure her problems." Dr. Ramsey further noted: "I previously concluded regarding [Trent's] apportionment issues and see no basis to change that conclusion." Dr. Ramsey also observed: "I had previously concluded that she is not only permanent and stationary, but precluded from work that involves enforced immobilization and sitting activities, but if breaks or relief from such is permitted, she could return to her prior job. Otherwise[,] vocational change is recommended." Dr. Ramsey concluded: "Overall, no changes in my previous conclusions and recommendations regarding the nature of her condition, its permanent

23.

and stationary status, causation and apportionment issues, treatment needs, or vocational issues are needed."

### E.     The Superior Court's Decision

The superior court issued a detailed and thorough 45-page decision in favor of Trent. The court noted the requisite analysis entailed two prongs: "The primary question is whether applicant is incapacitated from the performance of the duties of her position. Assuming the primary question is answered in the affirmative, the question then becomes whether there is a real and measurable connection between the incapacity and the employment."

The court first addressed the question whether Trent was incapacitated from the performance of the duties of her position. In this regard, the court stated:

> "Dr Tran's testimony was credible, even though he was, as the Referee described, very reluctant to use the precise language of the Government Code formulation. He was reluctant to find [Trent] 'permanent and stationary' even though he clearly described her as having a permanent, life-long, debilitating condition. It appears he is reluctant to make that statement out of concern he could be shutting the door to any medical treatment that could possibly offer her some hope for improvement, since he ties his inability to come to that diagnosis to his difficulty in getting her medical treatment approved.
>
> "Dr. Tran was very forthright in admitting that he is not well-versed in disability retirement language. However, [the Board] misstates and misconstrues his testimony when it argues that Dr. Tran testified that he had no opinion whether petitioner could or could not perform her job. He clearly stated she could not do a job where she needed to be seated six to eight hours a day. [Citation.] By the same token, Dr. Williams opined that there's no reason petitioner cannot work eight hours a day, without restrictions.[2] Dr. Tran also testified that she could not work at this point (even though he theoretically leaves the door open), and she was not a good candidate for vocational rehabilitation given her limitations and her heavy

---

**2**     With regard to Dr. Williams, the court found: "Dr. Williams'[s] report and testimony are not credible, so his conclusion that [Trent] is not substantially incapacitated from performing her job is not credible."

24.

narcotic use.[3] Also, it must be observed that even the *County* recognized she was incapacitated from working in her job since they terminated her because she could not do her job even with generous restrictions.

"Finally, Dr. Tran *did* opine that [Trent] was permanently incapacitated from performing her job when he filled out Part D portion of the retirement application. Clearly, he could read those words on the form, and he voluntarily checked the 'yes' box, and he checked 'no' when answering whether he expected a change in the disability. The court will interpret his testimony liberally in light of the policy of liberal construction of pension legislation. (*Heaton v. Marin County Employees Retirement Bd.* (1976) 63 Cal.App.3d 421, 429.) This is not a matter of 'magic words' that Dr. Tran failed to say at the hearing. When all his testimony and actions are construed together, and the testimony of [Trent], her significant other, and her mother are considered, the court finds that [Trent] met her burden of establishing that she is permanently incapacitated from performing her job duties."

The court next addressed the second prong of the analysis, that is, the "connection between incapacity and employment." (Unnecessary capitalization and italics omitted.) As to this prong, the court stated:

"Even where the work injury aggravated a pre-existing condition, an award of retirement benefits is appropriate if a material and traceable connection is shown between the workplace and the current (deteriorated) condition. (*Gelman v. Board of Retirement* (1978) 85 Cal.App.3d 92, 97 ["The inquiry is solely whether the employment is in fact *a* cause."] (italics original).)

"The court finds the evidence more than sufficient to rule that there is a material and traceable connection between the on-the-job injury occurring on March 8, 2012 and [Trent's] disability.

"In the first place, the nondisplaced transverse process fractures aid in showing a 'real and measurable' causal connection between the employment and the disability. (*Bowen v. Board of Retirement, supra*, 42 Cal.3d at p. 578.) Further, [Trent's] Harrington rods had been in place

---

**3** The court noted in a footnote: "While [vocational rehabilitation] is a worker's compensation concept, and not a retirement issue, it nonetheless shows that [Dr. Tran] recognized the field of view for [Trent's] working career is so narrow as to be nonexistent."

since childhood, and had been asymptomatic for years. The few doctor visits she had concerning her back were sporadic and appeared to have nothing to do with her scoliosis and Harrington rods. The referral for surgical consult regarding the rods was clearly connected to her workplace injury. Dr. Williams appeared to think that emphasis on Dr. Aryan saying this was a 'hardware related' pain must be taken to mean it had nothing to do with the accident. However, a look at the preoperative note for the surgery dispels that notion, since two items listed on both the preoperative and postoperative diagnoses are 'status post-fall' and 'failed medical/conservative management,' both of which are real and measurable connections to [Trent's] employment and the disability. And her subsequent treatment has simply flowed from the same stream.

"Furthermore, this case does appear to be a classic 'lighting up' of a preexisting nondisabling injury. 'The acceleration, aggravation or "lighting up" of a preexisting nondisabling condition is an injury in the employment causing it. [Citation.] The employer takes the employee as he finds him; thus compensation may be granted even though the employee's physical condition subjects him to industrial disability to which a healthy person would be relatively immune.['] (*Peter Kiewit Sons v. Industrial Acc. Commission* (1965) 234 Cal.App.2d 831, 837; *Gelman v. Board of Retirement* (1978) 85 Cal.App.3d 92, 96 [applied in retirement context].)"

The court concluded: "Since the court has found for [Trent] on both prongs of the requirements for service-connected retirement under Government Code section 31720, the court will grant [Trent's] request to issue a Peremptory Writ of Mandate."

### F. The Superior Court's Decision is Supported by Substantial Evidence in the Administrative Record

The superior court's decision is amply supported by substantial evidence in the administrative record. As noted in the court's carefully crafted decision, the court's finding on prong one of the requisite analysis, that is, that Trent was permanently incapacitated from performing her job duties, is supported by Dr. Tran's testimony, Dr. Tran's "Treating Physician's Statement" submitted with Trent's application for a disability retirement ("Part D" of disability retirement application), Trent's own testimony, and the testimony of Trent's family members.

Similarly, the court's finding on prong two of the analysis, that is, that there was a real and measurable connection between the disability and the job, is also supported by substantial evidence in the administrative record. Trent testified that she had scoliosis rods implanted in adolescence in 1984, and after a short recovery period, she was completely asymptomatic for decades. Trent's mother testified Trent was very athletic throughout her adulthood. On March 8, 2012, Trent suffered a workplace accident in an office stairwell. Trent described the accident. She explained her back impacted a wall with force when a man tumbled down a flight of stairs and fell on her, leaving her sandwiched between the man and the wall behind her. Dr. Williams testified that Trent suffered fractures of transverse processes following the workplace accident. Dr. Williams testified: "So she had the recent fall [on March 8, 2012], so it's probable that this fracture, these non-displaced fractures are associated with the fall. She has had prior CT scans in the past which didn't mention them, and she had subsequent ones which showed [they] had healed. So the timing is consistent with that it occurred with the injury [from the workplace accident]."

Trent suffered debilitating back pain, including in the thoracic spine. As discussed by Dr. Williams, she underwent back surgery following the accident to remove the scoliosis rods in her back, as it was suspected that the hardware in her back had been loosened as a result of the accident. However, her back issues—including muscle spasms, lumbar strain, and extreme pain requiring powerful pain medicines—continued to persist following her surgery. Ultimately, there were no viable treatment options other than conservative strategies with limited potential for improvement.

This evidence adequately supports the trial court's finding that there was a real and measurable causal connection between Trent's employment and her disability.

### G. *The Superior Court Did Not Commit Evidentiary or Due Process Errors*

The Board contends, without any specificity, that various "medical reports relied upon by [the] superior court were hearsay," and therefore, to the extent the superior court

relied on these unspecified reports, it prejudicially erred. (Unnecessary capitalization omitted.) The Board fails to identify the *specific* medical records that are the subject of its claim and to establish the prejudice flowing from the potentially erroneous use of *specific* records. Rather, the Board makes generalized and "blanket" contentions that are hard to follow and are not well taken.

The Board bases its argument on the rule of evidence applicable to administrative hearings under the retirement association's policy, that is, the "Fresno County Employees' Retirement Association (FCERA) Administrative Proceedings and Appeals to the Board Policy" (FCERA Policy). (Unnecessary capitalization omitted.) The FCERA Policy sets forth "procedures and rules for all evidentiary hearings." (Unnecessary capitalization omitted.) Section 13 of the FCERA Policy is entitled, "Rules of Evidence." FCERA Policy Section 13(a) (Section 13(a)) is relevant here. Section 13(a) provides:

> "The hearing need not be conducted according to technical rules of evidence relating to evidence and witnesses. *Any relevant evidence shall be admitted* if it is the sort of evidence on which responsible persons are accustomed to rely[ing] on in the conduct of serious affairs, regardless of the existence of any common law or statutory rule which might make improper the admission of the evidence over objection in civil actions. *Hearsay evidence may be used for the purpose of supplementing or explaining any direct evidence* but shall not be sufficient in itself to support a finding unless it would be admissible over objection in civil actions." (Italics added.)

As an initial matter, we note "it is well settled that the improper admission or rejection of evidence at an administrative hearing does not provide 'grounds for reversal unless the error has resulted in a miscarriage of justice' " and it is " 'reasonably probable a more favorable result would have been reached absent the error.' " (*Thornbrough v. Western Placer Unified School Dist.* (2013) 223 Cal.App.4th 169, 200 [observing, even " 'procedural due process violations … are subject to a harmless error analysis' "]; *McCoy v. Board of Retirement* (1986) 183 Cal.App.3d 1044, 1054 (*McCoy*) ["[a]n

28.

administrative agency is not required to observe the strict rules of evidence enforced in the courts, and the admission or rejection of evidence is not ground for reversal unless there has been a denial of justice"]; *Doe v. Occidental College* (2019) 40 Cal.App.5th 208, 225-226.)

Here, even assuming the superior court erred in relying on certain medical records that constituted hearsay, there was no miscarriage of justice warranting reversal, as the disputed evidence was not necessary to the judgment and the judgment was amply supported by other substantial evidence, such as the testimony of the testifying witnesses, the reports of Dr. Tran, and Trent's disability application (specifically, the attached treating physician statement completed by Dr. Tran). (*McCoy*, *supra*, 183 Cal.App.3d at p. 1054 [evidentiary error is not prejudicial if the subject evidence " 'was merely cumulative or corroborative of other evidence properly in the record,' or if the evidence 'was not necessary, the judgment being supported by other evidence' "].)

Since the Board does not specify which medical records it is referring to for purposes of its argument, we will limit ourselves to addressing Dr. Ramsey's reports of September 19, 2014 and February 10, 2016, and Dr. Aryan's reports, as discussed by Dr. Tran and Dr. Williams at the administrative hearing. These reports were properly admitted into evidence under Section 13(a) of the FCERA Policy, which rule expressly provides that "[a]ny relevant evidence shall be admitted," even if it would be rendered inadmissible by statutory rules in civil actions, so long as the evidence is of the type typically relied upon by responsible persons in the conduct of serious affairs. The medical records at issue qualify as relevant, admissible evidence under the foregoing test.

Furthermore, both Dr. Tran and Dr. Williams were questioned, during their respective testimony, regarding how these reports related to, underlay, or supplemented their own respective findings. These reports also explained and supplemented Trent's testimony about the medical interventions she had undergone, including the rod-removal surgery, her work restrictions and limitations, her prognosis, and the factors complicating

29.

any return-to-work strategy. Section 13(a) of the FCERA Policy expressly provides that "*[h]earsay evidence may be used for the purpose of supplementing or explaining any direct evidence*." (Italics added.) Here, the superior court could properly rely on the medical reports of Dr. Aryan and Dr. Ramsey as these reports explained and/or supplemented direct evidence in the record. (See *Melkonians*, *supra*, 174 Cal.App.4th at p. 1171 [the Confrontation Clause (U.S. Const., 6th Amend.) has no application in an administrative hearing].)

Section 13(a) of the FCERA Policy further provides that hearsay evidence "shall not be sufficient in itself to support a finding unless it would be admissible over objection in civil actions." As stated above, here the record contained direct evidence from Dr. Tran and Dr. Tran's "Treating Physician Statement," as well as from Trent and her family members. Furthermore, Dr. Williams also testified at length about Dr. Aryan's reports and Dr. Ramsey's reports and explained how that evidence related to other evidence in the record. Therefore, the superior court did not exclusively rely on hearsay evidence for its findings.

Even had the superior court relied exclusively on hearsay evidence for its findings, there would be no error, because there is no dispute that Dr. Aryan's reports and Dr. Ramsey's reports were authentic (both parties utilized the reports in questioning their own witnesses). Indeed, the parties stipulated as to foundation for most, if not all, of these reports. It does not really matter whether there was a stipulation as to foundation for these reports because Section 13(a) of the FCERA Policy explicitly provides that the technical rules of evidence do not apply in administrative hearings. Thus, in order to admit these reports for purposes of the administrative hearing, the parties were not required to establish a proper foundation, by, for example, establishing the reports qualified as business records. (See Evid. Code, § 1271.) The reports were admissible for all purposes if an appropriate foundation could be established in a civil proceeding.

30.

There is no reason to doubt that such a foundation could be established in a civil proceeding.

### H.    *Remaining Contentions of the Board of Retirement of the Fresno County Employees' Retirement Association*

As for any remaining miscellaneous contentions advanced by the Board, we either reject these contentions as meritless or conclude it is unnecessary for us to reach them; we reject some residual claims because they are not adequately developed and are therefore improperly raised.

## **<u>DISPOSITION</u>**

The judgment of the superior court is affirmed. Trent is awarded costs on appeal. To the extent Trent is entitled to attorney fees in relation to this appeal, Trent may bring an appropriate motion in the superior court.

SMITH, J.

WE CONCUR:

LEVY, Acting P. J.

PEÑA, J.

31.